**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

Filed/Docketed
Jan 18, 2011

IN RE:

**JAMES RANDALL MILLER,**

**Alleged Debtor.**

**Case No. 10-11541-M
Chapter 7**

**MEMORANDUM OPINION**

One of the most gifted teachers I ever studied under was Charles H. Whitebread.[1]  Professor Whitebread was entertaining, informative, and possessed the rare ability to make any legal subject understandable.  In his criminal procedure class, he often referred to grand juries as "pet alligators." According to Professor Whitebread, the problem with a pet alligator was its propensity to turn and bite its owners.  What he meant was that a grand jury was a great thing so long as it investigated the activities of people other than those who called for its formation.  Professor Whitebread would then reveal case after case where a grand jury indicted the individuals who had clamored for its creation. The good professor would then note that those who bought the alligator often tended to rue their decision.

An involuntary petition is bankruptcy's version of the "pet alligator."  When an involuntary petition is properly filed, life is good for the petitioning creditors.  In most cases, a trustee is appointed.  The financial affairs of the debtor are placed under scrutiny.  If the trustee deems it appropriate, actions are brought to recover assets that can be used to pay creditors.  In addition, the debtor is divested of control of its assets, including litigation that was pending at the time the case

---

[1]  Charles H. Whitebread (1943-2008).  Nationally renowned teacher, writer, and lecturer. George T. Pfleger Professor, Gould School of Law, University of Southern California, 1981–2008.  Professor of Law, University of Virginia, 1968–1981.  B.A., *summa cum laude*, Princeton University, 1965.  J.D., Yale Law School, 1968.  Editor of the Yale Law Journal. Author of 14 books and more than 30 law review articles.

was filed.  However, the filing of an involuntary petition carries significant risk.  The alleged debtor is entitled to contest the filing of an involuntary petition.  If the alleged debtor prevails, he or she may recover the fees and costs incurred in defending against the involuntary petition, and, in certain circumstances, consequential and punitive damages.  These sums can be considerable.  When an alleged debtor successfully defends an involuntary petition, it may be said that the pet alligator has bitten its owners.

Our case involves an alleged debtor, James Randall Miller ("Miller"), and four petitioning creditors, three of whom were involved in protracted litigation with Miller prior to the filing of the involuntary petition.  The creditors assert that their claims are beyond legitimate dispute, and that they have every right to bring Miller before this Court.  Miller contends that each petitioning creditor holds a disputed claim, or no claim at all, and is ineligible to file an involuntary petition against him.  Miller also argues that the involuntary petition was filed without regard for the facts or the law and for an improper purpose.  He seeks fees, costs, and damages.  The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014.

## Jurisdiction

The Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C.A. § 1334(b).[2] Reference to the Court of this contested matter is proper pursuant to 28 U.S.C.A. § 157(a).  The determination of whether an order for relief should be entered in an involuntary bankruptcy case is a core proceeding as contemplated by 28 U.S.C.A. § 157(b)(2)(A).

---

[2] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq*. (West 2010).

**Burden of Proof**

In order to file an involuntary petition in bankruptcy, a creditor must be "a holder of a claim against [the alleged debtor] that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount[.]"[3]  The burden of proof lies with the petitioning creditors to establish a prima facie case that their claims are not subject to a bona fide dispute.[4]  The burden then shifts to the alleged debtor to present evidence of a bona fide dispute.[5]  In addition, before a bankruptcy court may enter an order for relief in an involuntary proceeding, it must find that "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount[.]"[6] The petitioning creditors carry the burden of proof to show that a debtor is generally not paying its debts as they become due.[7]

**Findings of Fact**

On May 11, 2010, an involuntary petition in bankruptcy was filed against Miller by four petitioning creditors, each of whom is specifically identified and discussed later in this opinion. Miller is an attorney who practices law in Tulsa, Oklahoma.  Miller and his wife, Debbie Miller ("Debbie") (hereafter collectively referred to as "the Millers"), have more than twelve creditors for

---

[3]  § 303(b)(1).

[4]  *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1543–44 (10th Cir. 1988).

[5]  *Id.*

[6]  § 303(h)(1).

[7]  *Bartmann*, 853 F.2d at 1546; *see also In re Harmsen*, 320 B.R. 188, 197 (10th Cir. BAP 2005); *In re Brooklyn Res. Recovery, Inc.*, 216 B.R. 470, 482 (Bankr. E.D.N.Y. 1997).

3

purposes of this litigation.[8]  The record is largely devoid of any meaningful information regarding

the Millers' income.[9]  Other than the pledged assets claimed by the petitioning creditors, there is

little information in the record regarding the Millers' assets.  In addition, other than the litigation

between Miller and the various petitioning creditors, all of which is described in some detail later

in this opinion, there is no evidence in the record of other litigation or actions by the Millers that

could provide assets for the payment of creditors in this case (such as potentially preferential or

fraudulent transfers).

From February of  2005 through May of 2007, Miller was a partner in a law practice with

Louis Bullock and Patricia Bullock.  In addition to the practice of law, Miller was engaged in a

variety of real estate ventures, often using various corporations and partnerships.  It is those real

estate transactions, and those partnerships, that have brought us here today.

***The Claims of the Petitioning Creditors***

*Legacy Real Estate Investments, LLC*

Legacy Real Estate Investments, LLC ("Legacy") is a limited liability corporation that,

according to its manager, James A. Bush ("Bush"), is engaged in the business "of loaning and

collecting funds."  At issue herein are secured loans made by Legacy to Mill Creek Lodge Estates,

LLC ("MCLE") and Mill Creek Water Sales and Distribution, LLC ("MCWSD") (the "Legacy

---

[8]  *See Petitioning Creditors' Ex. 138* (listing in excess of 28 creditors).  Miller also testified to this fact at trial.  *See Transcript of Proceedings held on October 19 and 20, 2010, Docket No. 120,* Page 391, *ll.* 2 – 6.

[9]  For example, Miller Exhibit 156 is the Millers' 2009 Federal and Oklahoma State Income Tax returns.  These returns show business income of $129,812, with losses, both current and carryover, in excess of $1.2 million.  As a result, the Millers' adjusted gross income for 2009 is shown as a negative $1,141,365.

Loans"). The loans were secured by both real and personal property located in San Juan County, Colorado, and in Tulsa County, Oklahoma. These loans were personally guaranteed by Miller.[10]

The Legacy Loans fell into default in the fall of 2007. After several months of negotiation, on June 19, 2009, Legacy, MCLE, MCWSD, and Miller entered into an agreement simply titled "Foreclosure Agreement."[11] The Foreclosure Agreement is lengthy and detailed, encompassing 6 typed, single-spaced pages, plus exhibits and acknowledgments. Boiled down to its critical elements, the Foreclosure Agreement contained these terms:

1.    MCLE, MCWSD, and Miller acknowledged a debt to Legacy in the amount of $2,882,674.31 as of May 31, 2009, and agreed to confess judgment in this amount;

2.    MCLE, MCWSD, and Miller agreed to consent to a foreclosure action by Legacy foreclosing its liens upon its collateral. As part of the consent, MCLE, MCWSD, and Miller agreed "to not present any defense to, object, contest, delay or forestall, in any manner or for any reason whatsoever, the Legal Proceedings [brought by Legacy]";[12]

3.    MCLE, MCWSD, and Miller agreed that, while such foreclosure actions were pending, Legacy was to have "exclusive possession and control of the Collateral" and was to have "the full right and power to operate, manage, sell, lease or otherwise deal with the Collateral in such manner as [Legacy] may determine, in [Legacy's] sole discretion";[13]

4.    Upon execution of the Foreclosure Agreement, Legacy agreed to pay MCLE and MCWSD the sum of $17,000. In addition, so long as MCLE, MCWSD, and Miller were not in default under the terms of the Foreclosure Agreement, Legacy would make monthly payments of $8,500 to MCLE and MCWSD for an additional 22 months;

5.    In addition, "so long as Borrower and Guarantor [MCLE, MCWSD, and Miller] shall

---

[10] *Legacy Ex. 6.*

[11] *Legacy Ex. 1.*

[12] *Legacy Ex. 1-2.*

[13] *Legacy Ex. 1-3.*

> have performed all of their obligations hereunder, Lender [Legacy], for Lender and Lender's successors and assigns, shall be deemed to have fully and completely released Borrower and Guarantor from any and all liabilities, damages, causes of action and all claims of any nature whatsoever that Lender has against either Borrower or Guarantor arising out of any transaction occurring prior to the execution hereof."[14]

Unfortunately, instead of signaling the end of hostilities between Miller and Legacy, it was no more than a bump in the road of contention between them.

Legacy commenced its foreclosure action against MCLE, MCWSD, Miller, and others in the District Court of San Juan County, Colorado (the "Colorado District Court"), on July 20, 2009 (the "Legacy Foreclosure").[15] Legacy sought to foreclose its liens upon all of its real estate collateral and personal property, including all water rights relating to said real estate, together with a money judgment against MCLE, MCWSD, and Miller in the amount of $2,882.574.31, plus costs and attorney's fees, "if requested at trial."[16] Two days later, Legacy sought the appointment of a receiver over all of its collateral. The motion was made *ex parte*, and an order appointing a receiver was entered on July 30, 2009.[17]

Miller took issue with the filing of the Legacy Foreclosure. He filed various pleadings in response, seeking either dismissal of the action or a judgment in his favor. The theories advanced

---

[14] *Legacy Ex. 1-6.*

[15] *Legacy Ex. 17.*

[16] *Legacy Ex. 17-10.*

[17] *Legacy Ex. 18-18 and 18-19.* It appears that Legacy first obtained an order appointing a receiver on July 26, 2009, and then, for reasons unknown, asked that the July 26, 2009, order be vacated, and a new order appointing a receiver be entered in its place. Disputes regarding the receivership continued unabated throughout the Legacy Foreclosure. On at least one occasion, Legacy sought to hold Miller in contempt for his failure to cooperate with the receiver. None of the procedural or substantive gymnastics relating to the receiver are germane to the dispute before this Court.

by Miller in support of his claims included improper service, lack of subject matter jurisdiction, lack of personal jurisdiction, and the failure to join necessary parties.  In the alternative, Miller asked for a more definite statement regarding the collateral sought by Legacy, and also asked that the order appointing a receiver be stricken.[18]

On October 2, 2009, Legacy moved for summary judgment in the Legacy Foreclosure (the "Legacy MSJ").[19]  MCLE, MCWSD, and Miller all resisted the Legacy MSJ.  In a separate pleading, Miller contended that: (1) he executed the Foreclosure Agreement under duress; (2) he was fraudulently induced to sign the Foreclosure Agreement; and (3) Legacy had breached the Foreclosure Agreement.  In response, Legacy took issue with all statements made by Miller regarding the Foreclosure Agreement, and argued that the Foreclosure Agreement was "valid and binding to the extent Defendants [MCLE, MCWSD, and Miller] are to cooperate with this foreclosure proceeding."[20]

The Colorado District Court held a two-day hearing on the Legacy MSJ on October 28 and 29, 2009.  Miller appeared and participated at that hearing.  At that hearing, Legacy offered the Foreclosure Agreement into evidence, calling the document "the most critical element of this entire proceeding[.]"[21] This hearing was contentious.  The transcript of the proceedings contains as much legal haranguing as substantive evidence.  On more than one occasion, the trial court judge recessed the proceedings in an attempt to provide the parties with an opportunity to reach a settlement.

---

[18]  *Legacy Ex. 29.*

[19]  *Legacy Ex. 18-16.*  The actual motion for summary judgment is not part of the record in this case.

[20]  *Legacy Ex. 19-20.*

[21]  *Legacy Ex. 15-52* at *ll.* 15–18.

Although the parties did agree as to some issues, they did not agree on the ultimate issue.  At the end

of the day, the Colorado District Court entered its order granting the Legacy MSJ (the "MSJ

Order").  The MSJ Order provided in part as follows:

> [T]he Court being fully advised in the premises,
>
> HEREBY FINDS that there is no genuine issue for trial regarding Defendants
> MCLE's and MCWSD's default under the loan agreements and their admission to
> indebtedness in the amount of $2,882,574.31 under the Foreclosure Agreement.
>
> HEREBY FURTHER FINDS that there is no genuine dispute of material fact [that]
> Defendants MCLE and MCWSD agreed to a non-contested foreclosure pursuant to
> the Foreclosure Agreement and that Plaintiff Legacy Investments is entitled to
> foreclose on the real property, personal property and water rights of MCLE and
> MCWSD as secured by the loan agreements.  The court also finds that Defendant
> Miller's claims of duress and inappropriate financial pressure to enter into the
> "Foreclosure Agreement" are not GENUINE issues of material facts.
>
> HEREBY FURTHER FINDS that Plaintiff is entitled to judgment in the amount of
> $2,882,574.31, and to its reasonable attorneys' fees, fees and costs of collection,
> foreclosure costs and to pre- and post-judgment interest, **except as to the parties to
> the "Foreclosure Agreement" because attorneys fees and costs were waived as
> to them**.  The Court also finds Plaintiff is entitled to the entry of a Judgment and
> Decree of Foreclosure En Masse; and
>
> HEREBY GRANTS Plaintiff's Combined Motion and Brief for Summary Judgment
> Pursuant to C.R.C.P. 56(c) and orders Plaintiff to submit its Judgment and Decree
> of Foreclosure En Masse no later than November 18, 2009 and within fifteen days
> of the date of this Order to submit Plaintiff's attorneys' fees, fees and costs of
> collection, foreclosure costs and pre-and post-judgment interest.
>
> IT IS SO ORDERED BY THE COURT.[22]

On November 25, 2009, the Colorado District Court entered its "Judgment and Decree of

Foreclosure En Masse" (the "Colorado Decree").[23]  In the Colorado Decree, the Colorado District

---

[22] *Legacy Ex. 12-3* (emphasis added).

[23] *Legacy Ex. 13.*

Court again affirmatively stated that Legacy was not awarded any attorney's fees or costs of collection.[24]  The failure to award fees was not the result of an oversight.  The trial court judge affirmatively struck provisions in the original proposed decree that would have provided Legacy with the opportunity to be awarded its attorneys' fees and costs.  As the Colorado District Court struck the request for fees, it made direct reference to the Foreclosure Agreement, noting that Legacy was not entitled to any attorney's fees "because of Plaintiff's [Legacy's] agreement with Defendants as set forth in Exhibit 25 hearing Exhibit [sic]."[25]

While Legacy was pleased that it had finally obtained a decree of foreclosure, it was not happy with the failure of the Colorado District Court to award Legacy its attorney's fees and costs.  On December 8, 2009, Legacy filed its "Motion for Amendment of the Findings Pursuant to C.R.C.P. 59(a)(3)" (the "Legacy Motion to Amend").[26]  Legacy argued that the Colorado District Court abused its discretion in its failure to award Legacy its fees, contending that MCLE, MCWSD, and Miller had all breached the Foreclosure Agreement, rendering ineffective the release contained therein.  After considering the Legacy Motion to Amend, the Colorado District Court entered an order on January 13, 2010, denying the Legacy Motion to Amend in its entirety.[27]  The order contained the following provisions:

> The Court's October 29, 2009 Order was in favor of Legacy, making it the prevailing and successful party.  However, the provisions of Hearing Exhibit No. 25 "Foreclosure Agreement" also shown as Exhibit No. 12 attached to the complaint

---

[24]  *Id.* at 13-3 and 13-5.

[25]  *Id.* at 13-5.  *See also Legacy Ex. 15-52, ll.* 18 –19 (identifying Hearing Exhibit No. 25 as the Foreclosure Agreement).

[26]  *Legacy Ex. 21.*

[27]  *Legacy Ex. 14.*

preclude awarding attorney fees and costs to Legacy.  See: 10 page 5, paragraph 10 "Miscellaneous" sub paragraph (d) and page 6, paragraph 13 Subparagraph (b) "Mutual Release" and page 2, paragraph 4 "Confession of Judgments"

Legacy's loan agreements with Defendants Miller [defined as MCLE, MCWSD, and Miller] contain provisions entitling them to attorneys' fees and costs incurred for collection under the defaulted loans.  Pursuant to C.R.C.P. Rule 121 Section 1-22(2)(a) Legacy would be entitled to its attorneys' fees and costs but for the provisions of the "Foreclosure Agreement".

Legacy did not allege or prove a breach of contract of the "Foreclosure Agreement" by Defendants Miller as to any of the preconditions under that agreement that would entitle Legacy to a judgment for costs and attorney fees against Defendants Miller.[28]

This order was not appealed.

The property described in the Colorado Decree was sold at sheriff's sale on February 9, 2010.  Legacy was the successful bidder, bidding a total amount of $1,202,958.62.  At the hearing on the involuntary petition, Bush testified that the remaining amount due and owing to Legacy after application of the proceeds of the sheriff's sale was in excess of $1.6 million.[29]  Notwithstanding the entry of the decree of foreclosure and the filing of the involuntary petition, litigation in the Legacy Foreclosure has continued.[30]

*Summit Bank, NA*

Miller's loan relationship with Summit Bank, NA ("Summit") began in September 2006. As of March 15, 2007, Miller and one of his companies, East Village Property Company, LLC ("EVPC") were indebted to Summit under a Renewal Note in the maximum principal amount of

---

[28] *Id.*

[29] The exact amount claimed by Legacy on the involuntary petition was $1,820,364.00 "plus costs."  *See Docket No. 1.*

[30] *See, e.g., Legacy Ex. 16* (779 page transcript of a four-day hearing held June 28, 2010, through July 1, 2010).

$850,000 with a maturity date of March 15, 2009 (the "Renewal Note").[31]   The Renewal Note was secured by mortgages on various parcels of real estate, including a commercial office building in Tulsa known as the Kenosha Property that was owned by EVPC.[32]   MCLE guaranteed payment of the Renewal Note.[33]   To ensure repayment of the Renewal Note and performance of its guaranty obligation to Summit, MCLE executed a Real Estate Deed of Trust (the "Colorado DOT") covering a residential lot in San Juan County, Colorado (the "Colorado Lot").[34]   As additional security for the debt owed to Summit, on October 27, 2008, both Miller and Debbie granted Summit a real estate mortgage on certain residential real property located in Tulsa, Oklahoma (the "Norfolk Avenue Property").[35]

In April of 2007, Miller advised Summit that MCLE wanted to sell the Colorado Lot to Troy Hudspeth ("Hudspeth").   MCLE intended to finance the sale for a period of one year.   Summit agreed to release the Colorado DOT in exchange for receiving collateral rights in the MCLE loan to Hudspeth to secure payment of Miller and EVPC's obligations to Summit.   The sale to Hudspeth took place in late May and early June 2007.   Hudspeth executed a promissory note in favor of MCLE (the "Hudspeth Note"),[36] and granted a lien on the Colorado Lot to MCLE under a deed of

---

[31]   *Summit Ex. 50.*

[32]   *Summit Ex. 49.*

[33]   *Summit Ex. 51.*

[34]   *Summit Ex. 52.*

[35]   *Summit Ex. 62.*

[36]   *Summit Ex. 56.*

trust (the "Hudspeth DOT").[37]  MCLE then assigned the Hudspeth Note and the Hudspeth DOT to Summit as collateral for the amounts owed to Summit by Miller and EVPC (the "MCLE Assignment").[38]  As part of the transaction, Miller and EVPC executed and delivered a Second Renewal Note to Summit in the amount of $770,000.00 (the "Second Renewal Note").[39]

Hudspeth defaulted on the Hudspeth Note.  On December 13, 2007, Summit executed a document entitled "Colorado Statutory Power of Attorney for Property" (the "POA"), in which Summit authorized MCLE to commence foreclosure proceedings with respect to the Hudspeth DOT on behalf of Summit.[40]  The POA purported to give MCLE "the power to act for [Summit], without [Summit's] consent, in any way that [Summit] could act for [itself]."[41]  At the time the POA was given to MCLE, Miller and EVPC were not in default of their obligations to Summit.

Shortly after the POA was executed, MCLE commenced a foreclosure action against Hudspeth in the Colorado District Court on December 28, 2007 (the "Hudspeth Foreclosure").[42]  A Judgment foreclosing the Hudspeth DOT was entered in the Hudspeth Foreclosure on June 12, 2009.[43]  A sale of the Colorado Lot by the Sheriff of San Juan County, Colorado (the "Sheriff") was scheduled to take place on July 30, 2009.

---

[37] *Summit Ex. 57.*

[38] *Summit Ex. 54.*

[39] *Summit Ex. 55.*

[40] *Summit Ex. 60.*

[41] *Id.*

[42] *Summit Ex. 61.*

[43] *Summit Ex. 67.*

On or about June 19, 2009, MCLE entered into a real estate contract with Bush Mountain, LLC ("Bush Mountain"), under which Bush Mountain agreed to purchase the Colorado Lot for $500,000 (the "Bush Mountain PSA").[44]  The sale was to close on July 31, 2009, one day after the scheduled Sheriff's sale. All proceeds of the Bush Mountain PSA were to be paid to Summit. Summit expected to receive a minimum of $450,000 in proceeds from this sale.[45] Upon condition that it receive the proceeds from the Bush Mountain PSA, Summit agreed to extend the maturity date of the Second Renewal Note until July 31, 2010.[46]

The foreclosure sale took place as scheduled on July 30, 2009.  MCLE submitted a written bid to purchase the Colorado Lot at the Sheriff's sale in the amount of $889,053.73, the full amount Hudspeth owed MCLE under the Judgment.  Summit was aware of the amount of the bid and did not object.  MCLE was the sole bidder at the sale.  MCLE prepared and sent a Sheriff's Certificate of Purchase on the Colorado Lot to the Sheriff that was acknowledged on August 13, 2009, before a notary public and returned to MCLE without recording (the "Sheriff's Certificate").[47]  The Sheriff's Certificate reflected that MCLE was the purchaser at the Sheriff's sale and would be entitled to a deed for the property at the end of the redemption period unless redemption was made.

The sale of the Colorado Lot under the terms of the Bush Mountain PSA fell through on August 6, 2009, ostensibly because of the failure of MCLE to deliver an acceptable title insurance

---

[44] *Summit Ex. 66.*

[45] *Summit Ex. 64.*

[46] *Id.*

[47] *Summit Ex. 80.*  The Sheriff's Certificate was eventually recorded on September 3, 2009. *Summit Ex. 86.*

commitment.[48]  After this sale fell through, Miller continued to communicate with Mark Poole, the President and Chief Lending Officer of Summit ("Poole"), regarding loan extension and repayment options.  As part of the negotiations, Summit requested that Miller provide Summit with additional real estate collateral.  This did not happen.

On September 1, 2009, Summit sent a pleading to the Colorado District Court for filing in the Hudspeth Foreclosure.[49]  In the pleading, which was entitled "Motion to Clarify Journal Entry of Judgment, Certificate of Purchase, Report and Return of Sale, and Order Approving Sheriff's Sale" (the "Motion to Clarify"), Summit sought the following relief:

1.    A determination that Summit was the holder of the Hudspeth Note and the Hudspeth DOT;

2.    A finding that, with respect to the Hudspeth Foreclosure, MCLE acted solely as Summit's agent;

3.    A finding that Summit is the actual holder of the Sheriff's Certificate;

4.    An order directing the Sheriff to execute, deliver, and record a deed to the Colorado Lot listing Summit as the grantee; and

5.    Such other and further relief as may be just and proper.[50]

Summit did not object to the amount bid by MCLE for the Colorado Lot in the Motion to Clarify.  On September 9, 2009, the Sheriff executed a deed to the Colorado Lot listing Summit as the grantee (the "Summit Deed").[51]  The Summit Deed was filed of record on September 10, 2009.

While Summit was preparing and filing the Motion to Clarify, Miller was busy preparing

---

[48]  *Summit Ex. 78.*

[49]  *Miller Ex. 22.*

[50]  *Id.*

[51]  *Summit Ex. 88.*

additional documents relating to the Colorado Lot.  On or about September 1, 2009, Miller prepared

and executed a document entitled "Assignment of Sheriff's Certificate of Purchase Issued in Sale

No. 08-CV-01" (the "First Assignment").[52]   Under the terms of the First Assignment, MCLE

purported to assign all of its interest in the Sheriff's Certificate to Summit.  The First Assignment

also stated that

> This Assignment is made for the purpose of extinguishing any and all collateral
> interest and security interest in or against the Property in exchange for the full and
> final release by Assignee [Summit] of the certain Promissory Note dated March 15,
> 2007 by and between Assignee and Mill Creek Lodge Estates, LLC together with the
> release of any and all other liens and indebtedness to which the Property is or may
> be subject."[53]

Poole took issue with the release language in the First Assignment and demanded that it be

removed.[54]  In apparent response, Miller prepared and executed another  "Assignment of Sheriff's

Certificate of Purchase Issued in Sale No. 08-CV-01" (the "Second Assignment"),[55] that was dated

September 4, 2009.  The Second Assignment contained the following language:

> This Assignment is made for the purpose of extinguishing any and all collateral
> interest and security interest in or against the Property in exchange for the full and
> final release by Assignee [Summit] of the following all filed of record with the San
> Juan County Clerk and Recorder: that certain Promissory Note dated March 15,
> 2007 by and between Assignee and East Village Property Company, LLC/J. Randall
> Miller; that certain Modification of Mortgage dated March 15, 2007 by and between
> Assignee and East Village Property Company, LLC; that certain Guaranty dated
> March 15, 2007 by and between Assignee and Mill Creek Lodge Estates, LLC; Deed
> of Trust dated June 1, 2007 and Recorded June 5, 2007 at Reception Number
> 145733; Assignment of Deed of Trust and Promissory Note dated May 25, 2007,
> Recorded June 5, 2007 at Reception Number 145735; Power of Attorney dated

---

[52] *Summit Ex. 83.*

[53] *Id.*

[54] *Id.*

[55] *Summit Ex. 87.*

December 13, 2007, Recorded December 26, 2007 at Reception Number 146205; and together with the release of any and all other liens and indebtedness to which the Property is or may be subject.[56]

The Second Assignment was filed of record on September 4, 2009.

On October 15, 2009, Summit made formal demand upon Miller for payment of all amounts Summit claimed due and owing.[57]  Miller refused to make any such payments.  On November 26, 2009, Summit filed an action against the Millers, MCLE, and various other legal entities in the District Court in and for Tulsa County, Oklahoma (the "Summit State Court Action").[58]  The Summit State Court Action contains: (1) an action to foreclose Summit's mortgage lien on the Kenosha Property; (2) an action to foreclose Summit's mortgage lien on the Norfolk Avenue Property; (3) an action accusing Miller and MCLE of fraud and breach of fiduciary duty in connection with the Hudspeth Foreclosure, specifically with respect to the execution and filing of the Second Assignment; and (4) an action sounding in equity seeking a determination that the filing of the Second Assignment did not release Miller from any liability that Miller owed to Summit, and that Summit was authorized to sell the Colorado Lot without fear that its actions could be considered a full satisfaction of the debt owed by Miller and EVPC to Summit.  Miller filed an answer in the Summit State Court Action on May 7, 2010, alleging that all debt owed to Summit has been paid in full as a result of the sale of the Colorado Lot, and seeking dismissal of the Summit State Court Action with prejudice.  Miller also sought an award of attorney's fees and costs.[59]  The Summit State

---

[56] *Id.*

[57] *Miller Ex. 94.*

[58] *Summit Ex. 91.*

[59] *Summit Ex. 93.*

Court Action remained pending at the time of the filing of the involuntary petition.

Poole testified that the amount owed to Summit by Miller was $888,164.58 as of May 11, 2010, and that interest continued to accrue on the debt at the rate of $333.33 per day from and after that date.  As of the date of the involuntary petition, none of the real estate collateral claimed by Summit (the Colorado Lot, the Kenosha Property, and the Norfolk Avenue Property) had been liquidated.  There was no meaningful evidence in the record as to the value of these properties.[60]

*Louis and Patricia Bullock, d/b/a Bullock & Bullock*

The alleged claim of Louis and Patricia Bullock, d/b/a Bullock & Bullock ("Bullock") arises out of the transfer of $450,000 from Bullock to Miller on or about April 28, 2005 (the "Bullock Claim").  The parties have referred to this as an "assignment of fees."[61]  Although referred to as an assignment, the evidence is undisputed that the funds were transferred in the form of a check made payable to Miller.[62]  The funds were then deposited in an account in the names of Miller and

---

[60]  The parties did offer exhibits that contained some estimates of the value of the real estate collateral claimed by Summit.  Miller Exhibit 23 is a document entitled "Summit Bank Impaired Loan Evaluation Report."  This document, ostensibly prepared by Poole, shows a "net collateral value" of $700,000 for the various parcels of real estate claimed by Summit.  It appears to rely upon other appraisals of this real estate, none of which are part of the record.  Miller Exhibit 100 is an affidavit of Poole dated February 8, 2010, containing the caption of the Summit State Court Action.  In this affidavit, Poole opines that "recent information received by Plaintiff suggests that the Colorado lot has a current value far less than the sum of $500,000 offered and then withdrawn by Miller's former business partner."  Finally, Summit Exhibit 94 is an e-mail dated October 15, 2009, in which an individual identified as John Wells stated his belief that the Colorado Lot had a value of $350,000 or less.  The e-mail contains no meaningful analysis.  The Court gives these documents no weight on the issue of the actual value of the Colorado Lot or any of the other real estate pledged to Summit.

[61]  *See Pre-Trial Order, Docket No. 96, § 3D at ¶ 25.*

[62]  *Bullock Ex. 103.*

Debbie.[63]  Bullock issued Miller a Form 1099 (the "1099") for the $450,000 payment in January

2006, for the 2005 tax year, showing the payment as taxable income to Miller.  Miller's tax return

for 2005, filed in 2008, advised the Internal Revenue Service ("IRS") that the 1099 was issued in

error, that the $450,000 was in reality a loan, and that Miller had made some payments on the debt.[64]

Since April of 2005, Miller has caused a series of payments to be made to Bullock in partial

repayment of the Bullock Claim.  Upon demand by Bullock, the Millers made a payment of

$200,000 from their company, MCLE, on or about September 15, 2006; another payment of $50,000

from EVPC, on or about December 7, 2006; and a final payment of $10,000 from the Millers'

personal joint checking account on or about October 10, 2007.  No other payments have been made

by Miller or Debbie with respect to the Bullock Claim.  According to Louis Bullock, the remaining

amount due and owing on the Bullock Claim as of the date of filing the involuntary petition was

approximately $321,000.[65]

On or about March 17, 2007, Miller executed a written acknowledgment of a debt owed to

Bullock for services rendered in the amount of $256,556.04, promising to pay that indebtedness

together with interest beginning December 9, 2006, at a rate of 8% per annum.  On May 8, 2007,

Miller sent an e-mail to Louis Bullock in which he stated that

> The money that Debbie and I owe you and Pat is a constant source of pressure that
> is never far from our thoughts. The debt, and our struggle to repay it quickly, has
> long ago become unbearable to us both. It must be paid as soon as possible. I dread
> your emails as they remind me of your suffering. I do not enjoy our rare moments

---

[63]  *See Bullock Ex. 127.*

[64]  *See Pre-Trial Order, Docket No. 96, § 3D* at ¶ *26; see also Bullock Ex. 125,* at *Miller-BK-L-04103.*

[65]  The amount of the Bullock Claim is listed at $321,960.00 in the involuntary petition.
*See Docket No. 1.*

together in the office, as I feel obliged to detail any potential sources of return or revenue that may provide an extra dollar to send yours and Pat's way.[66]

During the period from April 10, 2007, through August 24, 2009, Bullock submitted no less than 17 statements to Miller seeking payment on the Bullock Claim.[67]  There is no evidence in the record to suggest that Miller ever responded to any of these statements with a claim that the debt did not exist or was subject to dispute.

The October 10, 2007, payment was accompanied by a letter from Miller to Louis Bullock.[68]

That letter contained the following statement:

> Enclosed please find a check in the amount of $10,000.00 which represents slightly more than 56% of the interest currently accrued on the Bullock & Bullock ("B&B") loan dated April 28, 2005 (the "B&B Loan") to the undersigned.  The B&B Loan was originally made in the principal amount of $450,000.00.  It is my understanding that the B&B Loan principal is presently $256,622.71.[69]

At the trial on the involuntary petition, Miller did not dispute the existence or validity of any of this documentary evidence.  Instead, Miller claimed that he is entitled to an "accounting" as to funds. The exact nature of the accounting sought and/or the party against whom the accounting is sought (whether it be the Bullocks individually, their law firm, or some other legal entity) is not clear on the record.[70]

---

[66] *Harley Ex. 100* at JRM-BK.0083.

[67] *Bullock Exs. 108 – 124.*

[68] *Bullock Ex. 107.*

[69] *Id.*

[70] The only possible explanation of the basis for the accounting demanded by Miller in the record is the copy of the answer and counterclaim filed by Miller in the state court action brought against Miller by Bullock to collect the amounts due under the Bullock Claim.  *Miller Ex. 122.*  The Court has reviewed this pleading and finds it to be largely unintelligible, at least with respect to the claim for an accounting.

19

In 2009, Bullock filed an action in the District Court of Tulsa County, Oklahoma, against the Millers, seeking to recover the amounts due and owing under the Bullock Claim.  That action was pending at the time of the filing of the involuntary petition.  Based upon the docket sheet in that case, it appears that Bullock sought summary judgment against the Millers, but the motion was denied.[71]

*Harley Consulting, LLC*

The claim of Harley Consulting, LLC ("Harley") arises out of transactions between F&M Bank ("F&M") and Miller & Keffer, LLP, a Texas limited liability partnership (the "Partnership"). The Partnership was formed on August 22, 2001, with Miller and William R. Keffer ("Keffer") as its original partners.  The Partnership was governed by a written partnership agreement dated August 23, 2001 (the "Partnership Agreement").[72]  Under the terms of the Partnership Agreement, Keffer was named as managing partner of the Partnership.  Section 6.3 of the Partnership Agreement outlined various limitations on the powers of each of the partners.  Specifically, § 6.3(a)(xiv) precluded any partners from "[c]reating any personal liability for any Partner other than that personal liability to which any Partner has agreed in writing," unless the same was approved by a majority vote of the partners.[73]

On or about July 9, 2004, Keffer executed and delivered to F&M a document entitled

---

[71] The evidence in the record with respect to this state court action is sparse, consisting of the state court docket sheet, as well as the original and amended petitions filed by Bullock. *Miller Exs. 24 – 26.*  While it appears that Miller filed counterclaims against Bullock, the nature of those counterclaims is impossible to ascertain.  It is equally impossible to ascertain the legal or factual basis for the state court's denial of Bullock's motion for summary judgment.

[72] *Miller Ex. 132.*

[73] *Id.,* § 6.3(a)(xiv) at Miller-BK-H-0007.

"Partnership Authorization" (the "F&M Authorization").[74]  The F&M Authorization was executed by Keffer in his capacity as a general partner of the Partnership.  The F&M Authorization listed Keffer as the person authorized by the Partnership to enter into loan agreements with F&M.  Miller is not identified anywhere within the F&M Authorization.  The F&M Authorization contains a provision stating that "[e]ach partner agrees to be jointly and severally liable for all of the Partnership's present and future obligations to Lender [F&M]."  Miller did not sign the F&M Authorization.[75]

On November 18, 2004, Miller executed and delivered to F&M two documents: (1) the "Miller & Keffer, LLP Loan Agreement" (the "F&M Loan Agreement")[76]; and (2) the "Miller & Keffer, LLP Advance Note" (the "Advance Note").[77]  The Advance Note was in the face amount of $4,000,000.  Each document lists the Partnership as the Borrower.  Although Miller signed both documents, it appears that he did so in his capacity as the "president" of the Partnership, or as a partner.  He did not sign a separate document in which he purported to personally guaranty the obligations owed by the Partnership to F&M.  As part of the transaction, F&M took a personal guaranty from Kenneth Fleming ("Fleming").[78]  Based upon internal loan documentation contained

---

[74] *Harley Ex. 95.*

[75] Interestingly, the F&M Authorization contains the following "note" immediately below the signature line for the Partnership: "If the partner signing this Authorization is designated by the foregoing document as one of the partners authorized to act on the Partnership's behalf, it is advisable to have this Authorization signed by at least one non-authorized partner of the Partnership."  For whatever reason, F&M chose not to heed this advice.

[76] *Harley Ex. 96.*

[77] *Harley Ex. 97.*

[78] *Miller Ex. 136.*

in the F&M loan files, it appears that the loan was made based upon the existence of the Fleming

guaranty.[79]  It also appears that, as of November 18, 2004, F&M had been provided with a copy of

the Partnership Agreement.[80]

      The Partnership defaulted on the Advance Note.  Fleming was called upon and made

payments to F&M under the terms of his guaranty.  In February of 2008, the Advance Note was sold

by F&M to Harley and an entity known as 315 Main Mall, LLC ("315").  Harley owns a two-thirds

interest in the Advance Note, with 315 owning the balance.  According to Jack Short ("Short"), the

witness called to testify on behalf of Harley, the remaining balance due on the Advance Note as of

the date of the filing of the involuntary petition was $169,768.59, plus interest.[81]  Short had not made

demand upon Miller for payment prior to the filing of the involuntary petition.  Neither Harley nor

Short had filed any litigation against Miller prior to the filing of the involuntary petition.

***Motivation Behind the Filing of the Involuntary Petition***

      Representatives of each of the petitioning creditors testified at trial regarding their

motivations for filing the involuntary proceeding.  At trial, Bush told the Court that Legacy made

the decision to join in the involuntary petition because an involuntary bankruptcy "would be a more

---

[79]  *Miller Exs. 135.002 and 137.*

[80]  The files of F&M contained a document entitled "Boarding Data Sheet" dated November 18, 2004.  *See Miller Ex. 140.*  Said document contains a direct reference to "Partnership Agreement 6.3(a)."  *Miller Ex. 140.002.*

[81]  Mr. Short is the executor of the Kenneth S. Fleming estate.  Although the record is less than crystal clear, it appears that Fleming was the managing partner of Harley and that Fleming was a guarantor of the Advance Note.  Harley succeeded to the position of having an interest in the Advance Note as a result of payment to F&M under the terms of its guaranty.  The estate then succeeded to that interest upon the death of Fleming.

efficient way of having these assets finally disseminated and distributed to Legacy."[82]   From the

context of the testimony, the Court concludes that Bush was referring to its collateral.   This

conclusion is consistent with the vast amount of documentary and testimonial evidence provided to

the Court that laid out, in almost agonizing detail, the history of highly contentious negotiation and

litigation between Legacy and Miller.   Bush also testified that he hoped that a trustee appointed in

the involuntary case would "oversee a rational distribution and [provide] overall finality to the

[liquidation of] the assets."[83]   In a deposition taken prior to trial, Bush testified that the filing of the

involuntary proceeding would eliminate the need for Bush to continue litigation in Colorado, and

would be less expensive.[84]

Poole's testimony on behalf of Summit establishes that he caused Summit to join in the

involuntary bankruptcy petition in order to collect the debt owed to Summit.[85]   Louis Bullock stated

---

[82]   *See Transcript of Proceedings held on October 19 and 20, 2010, Docket No. 119,* Page
78, *ll.* 17 – 20.

[83]   *Id.*, Page 78, *ll.*  21 – 25.

[84]   *Id.*, Page 96, *l.* 4 to Page 98, *l.* 3.

[85]   Poole's testimony on direct examination could not be more clear:

Q.      Now you ultimately made the decision to join as a petitioning creditor in
        this involuntary proceeding, correct?

A.      Yes, sir.

Q.      And what was your objective in joining?

A.      **<u>My objective was — is the same objective I've had all along, is to try
        to find a way to get our loan repaid at Summit Bank</u>**.

*Id.*, Page 211, *ll.*  19 – 24 (emphasis added).   Poole reiterated these motives on cross-
examination. *Id.*, Page 215, *ll.* 5 – 7.

his belief that the filing of a bankruptcy petition would be "the most efficient way to collect on the moneys owed" to Bullock by Miller.[86]  While Louis Bullock later suggested that Miller may possess some assets that would be available to satisfy claims, he was unable to identify any of them with particularity.  Short, the representative called to testify on behalf of Harley, testified that "after consultation with the attorneys we felt like it [the involuntary petition] would be more efficient versus a filing of a collection suit."[87]

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by this reference.

### Conclusions of Law

Contested involuntary petitions, at least in this Court, are few and far between.[88]  There are many valid reasons why.

> The filing of an involuntary bankruptcy petition is, to say the least, a serious matter. Such a filing is a public statement by creditors that the alleged debtor is in enough financial difficulty that the power of a federal bankruptcy court is appropriately invoked to force the debtor to address the problems. In a commercial setting, an involuntary filing may have a number of consequences, ranging from plummeting employee morale, to lost customers, credit problems, and damage to a businesses' reputation. In a filing made against an individual, many of the same concerns exist, coupled with embarrassment on both a personal and a professional level. Because of this, "[t]he filing of an Involuntary Petition should not be lightly undertaken. Even the good-faith filing of such a petition creates onerous circumstances for a debtor." *In re Advance Press & Litho, Inc.,* 46 B.R. 700, 702 (Bankr. D. Colo. 1984).

---

[86] *Transcript of Proceedings held on October 20, 2010, Docket No. 120,* Page 330, *ll.* 1 – 5.

[87] *Id.*, Page 343, *ll.* 2 – 5.

[88] This case marks only the second contested involuntary case in this judge's tenure of nearly fourteen years.  Much of the analysis contained herein is an updated version of this Court's opinion in the prior contested involuntary case.  *See In re ELRS Loss Mitigation, LLC*, 325 B.R. 604 (Bankr. N.D. Okla. 2005).

While Congress recognized that filing an involuntary bankruptcy case is sometimes necessary and appropriate, it also recognized the harm that can be caused by an unjustified filing. An alleged debtor who is subjected to an unjustified filing can move to dismiss the petition and, under certain circumstances, be awarded sanctions. 11 U.S.C. § 303(i).  Sanctions are potentially available under this section if three conditions are met: the court dismissed the involuntary petition, the dismissal was not based on consent of the parties, and the alleged debtor preserved the right to recover under the statute. *See In re R. Eric Peterson Constr. Co.,* 951 F.2d 1175, 1179 (10th Cir. 1991).[89]

Given the consequences to a debtor and the risks of damage awards to the unsuccessful petitioners, the filing of an involuntary bankruptcy is a hazardous proposition for all involved.

In order to determine whether an involuntary petition is valid, a bankruptcy court must undertake a two-part analysis.  Initially, the court must determine that the creditors who brought the petition are eligible to do so.  If the petitioning creditors lack standing, the bankruptcy court lacks jurisdiction, and the case must be dismissed.  In addition, the court must make a finding that the alleged debtor is generally not paying its debts as those debts fall due.  If the debtor is generally paying its debts as they fall due, the case should not go forward.  Miller contests both points.

### Eligibility of the Petitioning Creditors

The filing of an involuntary petition is governed by § 303(b) of the Bankruptcy Code, which provides that:

**(b)** An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title–

---

[89]  *In re Cadillac by DeLorean & DeLorean Cadillac, Inc.*, 265 B.R. 574, 580 (Bankr. N.D. Ohio 2001) (footnote omitted).  *See also In re Brooklyn Res. Recovery, Inc.*, 216 B.R. 470, 486 (Bankr. E.D.N.Y. 1997) ("Involuntary bankruptcy is an extreme remedy with dire consequences upon a business enterprise.  Such a remedy exists as an avenue of relief for the benefit of the overall creditor body of troubled businesses.  Involuntary bankruptcy was not intended to redress the special grievances, no matter how legitimate, of particular creditors of a business otherwise holding its own.").

**(1)** by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $14,425 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

**(2)** if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $14,425 of such claims[.][90]

This section sets out both quantitative and qualitative requirements: if there are more than twelve eligible creditors, the petition must be brought by not less than three such creditors. Moreover, the claims of the petitioning creditors must not be subject to "bona fide dispute as to liability or amount." The Court has concluded that Miller has more than 12 such creditors; indeed, none of the parties appear to dispute this fact.[91] As a result, in this case the involuntary petition must have been filed by not less than three creditors whose claims are not in bona fide dispute.

On the issue of what constitutes a "bona fide dispute" for purposes of § 303(b)(1), the United States Court of Appeals for the Tenth Circuit has provided significant guidance:

For creditors to successfully petition for involuntary bankruptcy, the bankruptcy court must determine that the creditors have standing and that the debtor generally has not been paying his debts as they become due. Pursuant to 11 U.S.C. § 303(b)(1), a petitioning creditor does not have standing when its debt is subject to a bona fide dispute. The term "bona fide dispute" is not defined in the Code and has been the subject of much debate. We choose to adopt the standard propounded by the Seventh Circuit as to what constitutes a bona fide dispute: "the bankruptcy court must determine whether there is an objective basis for either a factual or a legal

---

[90] § 303(b)(1) and (2).

[91] There is no issue regarding the number of Miller's creditors contained in the Pre-Trial Order. *See Docket No. 96.*

dispute as to the validity of debt."   The court need not determine the probable outcome of the dispute, but merely whether one exists.  Once the petitioning creditor establishes a prima facie case that its claim is not subject to a bona fide dispute, the burden shifts to the debtor to present evidence of a bona fide dispute.  Under this objective approach, the debtor's subjective intent does not control whether a claim is considered to be subject to a bona fide dispute.[92]

The Bankruptcy Appellate Panel of the Tenth Circuit has held that, while "[t]he mere existence of pending litigation is insufficient to establish the existence of a bona fide dispute, . . . the pendency of litigation suggests that a bona fide dispute exists."[93]  The position taken by these courts falls well within the mainstream of legal thought on this issue.[94]

Four creditors have asked this Court to place Miller in an involuntary Chapter 7 bankruptcy case.  The question is whether at least three of those creditors have unsecured claims that total more than $14,425 and are not in bona fide dispute.[95]  The Court will consider the claims one by one.

------

[92] *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1543–44 (10th Cir. 1988) (citations and footnotes omitted).

[93] *In re Red Rock Rig 101, Ltd.*, No. WO-07-073, 397 B.R. 545 (Table), 2008 WL 2052732 (10th Cir. BAP 2008) (unpublished decision) (citations omitted).

[94] *See, e.g., Liberty Tool, & Mfg. v. Vortex Fishing Sys., Inc. (In re Vortex Fishing Sys., Inc.)*, 277 F.3d 1057, 1064 (9th Cir. 2002); *Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 221 (5th Cir. 1993); *Rimell v. Mark Twain Bank (In re Rimell)*, 946 F.2d 1363, 1365 (8th Cir. 1991); *In re Manhattan Indus., Inc.*, 224 B.R. 195, 199 (Bankr. M.D. Fla. 1997); *In re Ballato*, 252 B.R. 553,  556–57 (Bankr. M.D. Fla. 2000).  This list is intended to be illustrative rather than exhaustive.

[95] *See* 2 *Collier on Bankruptcy* ¶ 303.15 at 303-53 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.) ("Another aspect of the dollar requirement is that the dollar amount must be calculated based on unsecured, as distinguished from secured, debt.  This is supported by the language 'more than the value of any lien on property . . . securing such claims.'  In other words, the dollar requirement can only be composed of either the undersecured portion of a petitioning secured creditor's claim or a totally unsecured claim of a petitioning unsecured creditor.  This means that the secured portion of a secured creditor's claim cannot count for the dollar requirement.").

*Legacy Real Estate Investments, LLC*

Legacy's viability as a petitioning creditor hinges upon the Foreclosure Agreement. Indeed, for Legacy, the Foreclosure Agreement may be "the most critical element of this entire proceeding." There can be no doubt that the Foreclosure Agreement contains a release of Miller. There is also little question that Miller's release was conditional. Put simply, in order to reap the benefits of the Foreclosure Agreement (including the release of liability), Miller was required to cooperate with Legacy in the Legacy Foreclosure. The record before the Court suggests that he did not. The issue is complicated by the finding of the Colorado District Court that Legacy was precluded by the terms of the Foreclosure Agreement from recovering its attorney's fees and costs incurred in the Legacy Foreclosure.

Legacy argues that whether the release of Miller contained in the Foreclosure Agreement was enforceable was not at issue in the Legacy Foreclosure. The record indicates otherwise. Legacy's counsel went so far as to tell the Colorado District Court that the Foreclosure Agreement was "the most critical element" to resolution of the Legacy Foreclosure. When Legacy sought an award of attorney's fees against Miller in the Legacy Foreclosure, the Colorado District Court said no, relying upon the release contained in the Foreclosure Agreement. When Legacy asked the Colorado District Court to reconsider its position, suggesting that the Colorado District Court may have abused its discretion or overstepped its bounds, the Colorado District Court again said no. The Colorado District Court acknowledged that if the Foreclosure Agreement (and the release contained therein) did not exist, Legacy would have been entitled to its fees.

The Court assumes for purposes of its decision that after application of the proceeds of the sale of its collateral, Legacy has a remaining balance due in excess of $1.6 million. The question

28

is whether there exists a bona fide dispute regarding Miller's liability for any such amount.  In order to rule in Legacy's favor, the Court would have to ignore the rulings of the Colorado District Court and effectively set them aside.  The Court does not opine as to whether the decision of the Colorado District Court operates to bar any further action against Miller personally by Legacy, or whether it is a conclusive finding that Miller is entitled to the full protection of the release contained in the Foreclosure Agreement.  The Court merely notes that, at a minimum, an issue regarding the effectiveness of the release of Miller is present, and that the issue creates a bona fide dispute regarding the validity of the Legacy claim against Miller.

Legacy cites various cases that state a creditor need not seek a judgment against a guarantor as part of its foreclosure action.[96]  This Court agrees with those decisions.  A creditor does not have to sue a guarantor in order to foreclose liens upon collateral.  However, Legacy placed the operative provisions of the Foreclosure Agreement (and the release contained thereunder) at issue in the Legacy Foreclosure when it sought fees against Miller personally.[97]  There can be little doubt that had Legacy prevailed before the Colorado District Court on the issue of Miller's personal liability for its attorney's fees, Legacy would present that ruling as proof of Miller's personal liability to Legacy for all amounts.  Unfortunately for Legacy, the Colorado District Court ruled against it on

---

[96] *See, e.g., United States v. Newton Livestock Auction Market, Inc.,* 336 F.2d 673, 677 (commencement of foreclosure action does not operate as an election of remedies that would preclude a judgment against guarantors); *Joe Heaston Tractor & Implement Co. v. Sec. Accept. Corp.*, 243 F.2d 196, 199 (10th Cir. 1957) (action on guaranty may be brought separately from action against primary debtor).

[97] *See Miller Ex. 6.010* (seeking an award of attorney's fees against all defendants in the Legacy Foreclosure); *Legacy Ex. 14* (expressly denying a request by Legacy for an award of attorney's fees against MCLE, MCWSD, <u>and Miller</u>); and *Legacy Ex. 21* (in which Legacy asks the Colorado District Court to reconsider its order denying an award of attorney's fees against MCLE, MCWSD, <u>and Miller</u>).

the issue of Miller's liability for those fees.  The finding of the Colorado District Court that the release of Miller precluded an award of attorney's fees against Miller in the Colorado Foreclosure creates a bona fide dispute regarding any liability Miller may owe to Legacy.  That dispute is sufficient to defeat Legacy's status as a petitioning creditor in this case.

*Summit Bank, NA*

The Court has no doubt that Summit loaned Miller or his related entities the sum of $800,000, and that Miller was either directly obligated on or personally guaranteed the loans. Significant questions remain regarding the effects of the Hudspeth Foreclosure and the Summit Deed, as well as what amount, if any, of any claim held by Summit is an unsecured claim.  These questions preclude a finding that Summit's claim is not the subject of a bona fide dispute.

The Hudspeth Foreclosure is full of interesting issues.  Clearly, Miller attempted to extinguish all liability to Summit by preparing and recording the Second Assignment.  Summit argues that any such actions by Miller are in violation of his duties to Summit under the POA. Summit also contends that Miller breached his duties to Summit under general principles of agency law, and that his bid of the entire amount owed under the Hudspeth Note had no effect upon the amounts owed to Summit. While these arguments may be valid, they are not dispositive.  Summit makes no mention of the 800 pound gorilla that sits in the middle of the room: namely, the Motion to Clarify.  What is the Court to make of the fact that Summit actively petitioned the Colorado District Court to place title to the Colorado Lot in the name of Summit?  What is the Court to make of the fact that Summit's wishes were granted, and that Summit has held title to the Colorado Lot since September of 2009?  These are real issues that must be resolved in order to determine the viability of Summit's claim.  The filing of the Summit State Court Action by Summit is tantamount

to an admission to that effect.[98]

Yet another issue dooms the Summit claim for our purposes. Section 303(b)(1) speaks of claims that "aggregate at least $14,425 more than the value of any lien on property of the debtor securing such claims[.]"[99] In other words, in order to be eligible as a petitioning creditor, a creditor must be the holder of an unsecured (or at least a partially unsecured) claim. If we assume that Summit has a claim of $888,164.58 secured by the Colorado Lot, the Kenosha Property, and the Norfolk Avenue Property, how is the Court to determine whether Summit holds an unsecured claim in excess of the value of those properties? Summit has presented no credible evidence in this regard.[100] The Court does not know whether the properties claimed by Summit as collateral are worth enough to satisfy its alleged claims, or whether a deficiency would exist after those properties were sold. The Court is not required to speculate on this issue, nor, at least in this judge's opinion, would such speculation be appropriate.

There are significant questions regarding whether Summit continues to have a claim against Miller. There are also significant questions, based upon the record before this Court, as to what amount, if any, of Summit's claim would be considered an unsecured claim. These questions create a bona fide dispute with respect to the Summit claim, both as to liability and amount. Summit is not eligible to be a petitioning creditor in this case.

---

[98] The parties (as well as any other interested party that may some day review this Memorandum Opinion) are reminded that the Court is not attempting to resolve the validity of the Summit claim. The Court is merely noting that a bona fide dispute exists with respect to the Summit claim. The ultimate resolution of that claim is left to another day and to another court.

[99] § 303(b)(1).

[100] See Note 60 supra.

*Louis and Patricia Bullock, d/b/a Bullock & Bullock*

The Court concludes that Bullock has met the burden of showing that the Bullock Claim is not subject to bona fide dispute as to liability or amount.  They have established that the sum of $450,000 was transferred to Miller.  They have presented documentary evidence establishing that Miller acknowledged the validity of the Bullock Claim on several occasions.  In addition, the evidence establishes that Miller affirmatively stated to the IRS that the Bullock Claim was a debt.  Numerous billing statements were presented establishing the amount of the Bullock Claim.  Louis Bullock testified without objection that the amount of the Bullock Claim as of the date of the filing of the involuntary petition was in excess of $321,000.  This amount is consistent with the amount set forth in the involuntary petition.

As a result of this evidence, the burden shifts to Miller to present evidence of a bona fide dispute with respect to the Bullock Claim.  The only "evidence" presented by Miller is his testimony that he believes he is entitled to an "accounting."  Miller did not enlighten the Court as to what entity was to provide the accounting, or what monies were to be accounted for.  The fact that Miller believes he is somehow entitled to an accounting from someone is not enough to create a bona fide dispute as to the Bullock Claim.  The Court finds that the Bullock Claim is not the subject of a bona fide dispute, and that Bullock is entitled to be a petitioning creditor in this case.

*Harley Consulting, LLC*

Harley is the successor-in-interest to the claim once held by F&M against the Partnership.  For purposes of this decision, the Court assumes that the claim against the Partnership is valid, and is in an amount not less than $169,768.59.  The question is whether Harley holds a claim against Miller for any of those sums, and whether any such claim is subject to a bona fide dispute.

32

Miller did not execute a personal guaranty in favor of F&M, nor did F&M require a personal guaranty from Miller, as F&M saw Fleming as its primary source of repayment. F&M had a copy of the Partnership Agreement available to it when the Advance Note was executed. F&M thus had reason to know of the provisions in the Partnership Agreement prohibiting one partner from making another partner personally liable for the debts of the Partnership. On this basis, Miller contends that F&M knew or should have known of the restrictions in the Partnership Agreement, and that, as a result, he is not personally liable to Harley, F&M's successor. Harley, on the other hand, argues that Miller knew or should have known of the provisions in the F&M Authorization that purported to make Miller jointly and severally liable for all obligations owed to F&M by the Partnership. However, Miller did not sign the F&M Authorization, and there is nothing in the record before the Court to establish that Miller saw the F&M Authorization prior to the filing of this involuntary petition.[101]

In sum, what we have here is two conflicting documents: one that purports to limit Miller's personal liability for partnership debt, and another that proposes to cement it. One document was signed by Miller, one was not. The document that purports to limit Miller's personal liability was in the hands of F&M when it extended credit to the Partnership. Whether Miller ever saw the document that arguably renders him personally liable for the debt owed to Harley is an open question. The Court finds that Miller's liability to Harley is a matter of bona fide dispute. Harley is not qualified to be a petitioning creditor in this case.

---

[101] The F&M Authorization does not contain an acknowledgment by Keffer that he was provided a copy of the F&M Authorization after it was signed. *See Harley Ex. 95*. If Keffer never got a copy of the F&M Authorization, there is no reason to believe that Miller was ever aware of its terms.

In support of its argument that Miller's personal liability for the Harley debt is beyond dispute, Harley makes two additional arguments.  First, Harley argues that the existence of two separate e-mails in which Miller noted that he was paying a portion of the interest on this debt operates as an admission of his personal liability for the same.[102]  The Court is not persuaded.  Each of these e-mails contains statements to the effect that Miller was paying part of the debt that was then owed to F&M.  Each of these e-mails also makes reference to the fact that Miller was trying to keep the Partnership alive, and that paying the debt was part of that process.[103]  The statements do not constitute an admission that Miller was personally liable for the debt.  Harley also posits that Miller's actions in signing the F&M Loan Agreement and the Advance Note operate to make Miller personally liable for the Harley debt.  The Court disagrees.  In each case, the borrower was the **Partnership**, not Miller individually.  Section 3.2 of the F&M Loan Agreement refers to the existence of guarantors of the Advance Note, and refers the parties to "Schedule 3.2," which is to be a list of guarantors required by F&M.[104]  The Court has no way of knowing if Miller's name appears on "Schedule 3.2," as the schedule was not attached to the F&M Loan Agreement.[105]  Miller's signature on the Advance Note on behalf of the Partnership does not in and of itself render

---

[102]  *Harley Exs. 100 & 101.*

[103]  *See, e.g., Harley Ex 100* ("As you will recall, in early December when we met with David I raised the fact that I was paying quarterly interest on the F&M debt, and that while you and I would take care of our share of the interest through MKBP, David needed to immediately address the interest I had already paid, and get his share of the debt paid so that I wouldn't have to make additional payments attributable to David's portion.") and *Harley Ex. 101* ("Please rethink your decision to not help MKBP pay the monthly interest on the F&M poultry note. It is a heavy burden for me to carry alone until the poultry litigation pays.").

[104]  *See Harley Ex. 96* at 6, § 3.2.

[105]  If Schedule 3.2 exists, it is not part of the record in this case.  The Court has no choice but to rely upon the documents offered by Harley in support of its claim.

Miller personally liable for the debt.  That is what guaranties are for.  Harley does not have such a guaranty from Miller.  Moreover, based upon the documents contained in the F&M file for this loan, it does not appear that F&M had any interest in securing a personal guaranty from Miller.[106]

***Conclusion Regarding Dismissal of the Involuntary Petition***

Of the four petitioning creditors, only Bullock holds a claim that is not the subject of bona fide dispute for purposes of § 303(b)(1).  Miller has a total of more than twelve creditors.  The Court need not reach the issue of whether Miller was generally paying his debts as the same fell due.  As a result of there being less than the statutorily required number of eligible petitioning creditors, the involuntary petition must be dismissed.

***Damages, Fees, and Costs***[107]

Under § 303(i),

If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment–

**(1)** against the petitioners and in favor of the debtor for–

**(A)** costs; or
**(B)** a reasonable attorney's fee; or

**(2)** against any petitioner that filed the petition in bad faith, for–

**(A)** any damages proximately caused by such filing; or

---

[106]  The "Boarding Data Sheet" prepared by F&M for the Advance Note lists Kenneth S. Fleming and Robert E. Lorton as guarantors of the Advance Note, and includes guaranties from each of these individuals as documentation to be executed as part of the loan closing.  The requirement of a guaranty from Miller is conspicuously absent. *See Miller Ex. 140*.

[107]  Once again, a significant portion of the Court's analysis herein is taken from its prior decision in *In re ELRS Loss Mitigation, LLC*, 325 B.R. 604 (Bankr. N.D. Okla. 2005).

**(B)** punitive damages.[108]

As one court ably stated,

> Courts have construed and applied § 303(i)(1) as a "fee-shifting" statute, designed to transfer the costs of litigating the action to the nonmoving party. *See Keiter v. Stracka,* 192 B.R. 150, 160 (S.D. Tex. 1996) (citations omitted). When determining whether to award costs and fees, courts examine the totality of the circumstances. *In re Fox,* 171 B.R. 31, 33 (Bankr. E.D. Va. 1994). More specifically, courts weigh such factors as the reasonableness of petitioners' actions, petitioners' motives and objectives, and the merits of petitioners' view that filing was appropriate. *See In re K.P. Enter.*, 135 B.R. 174, 177 (Bankr. D. Me. 1992). An award of costs and fees does not require a showing of bad faith, but bad faith may be taken into account. *Camelot, Inc. v. Hayden,* 30 B.R. 409, 411 (E.D. Tenn. 1983); *In re Atlas Mach. and Iron Works, Inc.,* 190 B.R. 796, 802 (Bankr. E.D. Va. 1995).[109]

It has been held that this "section is permissive, however, leaving the assessment of fees, costs and damages to the exclusive discretion of the court."[110]   All petitioning creditors, regardless of the viability of their claims against the debtor, are subject to this statute and may be held to pay fees, costs, and damages.[111]   The Court assumes that their counsel advised them of these potential consequences.  As the old saying goes, in for a penny, in for a pound.[112]

When it comes to the issue of bad faith in the filing of an involuntary petition, the cases fall

---

[108]  § 303(i).

[109]  *In re Cadillac by DeLorean & DeLorean Cadillac, Inc.*, 265 B.R. 574, 581 (Bankr. N.D. Ohio 2001).

[110]  *In re Silverman*, 230 B.R. 46, 50 (Bankr. D.N.J. 1998) (and cases cited therein).

[111]  *See In re Kidwell*, 158 B.R. 203, 216 (Bankr. E.D. Cal. 1993) ("If an involuntary petition is dismissed other than on the consent of the debtor and all petitioners, the petitioners may be required to pay the debtor's costs and attorney's fees. 11 U.S.C. § 303(i)(1). All petitioners, even those who have joined under section 303(c), are vulnerable to this remedy that arises upon dismissal of the case.").

[112]  Or as another court so eloquently stated, "one who swats at the hornet had best kill it." *Id.* at 213.

into one of four categories: (1) the "improper purpose" test, which looks at whether "the filing of the [involuntary] petition was motivated by ill will, malice or for the purpose of embarrassing or harassing the debtor";[113] (2) the "improper use" test, which looks at whether "a creditor's actions amount to an improper use of the Bankruptcy Code as a substitute for customary collection procedures";[114] (3) the "Rule 9011" test, which applies the standards of Federal Rule of Bankruptcy Procedure 9011 to the filing of an involuntary petition, requiring the filing to be well based in law and fact and not filed for an improper purpose such as harassment, delay, or increasing the cost of litigation;[115] and (4) the "objective test," which asks whether a "reasonable person" would have found the filing to be proper based upon the particular facts of the case.[116]  There appears to be no controlling authority in the Tenth Circuit on the issue of what test is to be applied.

Here, we have three creditors (Legacy, Summit, and Bullock) that have been involved in business relationships with Miller that have foundered.  All three have been involved in protracted negotiations and litigation with Miller.  This Court has read virtually every page of the trial transcripts submitted as exhibits.  It understands the contentious nature of that litigation.  In the eyes of the petitioning creditors that have sued him, Miller has been cantankerous.  With respect to the other petitioning creditor, litigation has yet to commence, but it is clear that any litigation brought against Miller by Harley will be met with vigor.  A reasonable person could easily conclude that the state court litigation between these parties will continue unabated for years.

---

[113] *In re Better Care*, *Ltd.*, 97 B.R. 405, 410 (Bankr. N.D. Ill. 1989) (citation omitted).

[114] *Id.* (and cases cited therein).

[115] *In re Turner*, 80 B.R. 618, 623 (Bankr. D. Mass. 1987).

[116] *In re Wavelength, Inc.*, 61 B.R. 614, 620 (9th Cir. BAP 1986).

All of the petitioning creditors have admitted that their primary motivation in filing this case was to collect upon their debts, and that one of their goals is "to have an objectively reasonable person (a trustee) administer [Miller's] financial affairs."[117]  In other words, the petitioning creditors are tired of dealing with Miller.  They want a trustee to step in, review matters, and become the real party-in-interest with respect to their liens and/or collection of their debts.  The frustration of Legacy, Summit, Bullock, and their counsel is obvious.  But is it proper to file a bankruptcy case for the primary purpose of displacing a debtor for purposes of collection litigation?  This Court agrees with those courts that have held that it is not.[118]  A bankruptcy court is not to be used as a substitute forum for collection when a creditor becomes dissatisfied with its collection efforts in a court of competent jurisdiction.[119]

The petitioning creditors argue that their purpose in filing this case was to provide for "the

---

[117] *Petitioning Creditors' Closing Statement and Argument in Support* submitted November 17, 2010, at p. 29.

[118] *See, e.g., In re Nordbrock*, 772 F.2d 397, 399 (8th Cir. 1985) ("This case reflects efforts by a single creditor to use the Bankruptcy Court as a forum for the trial and collection of an isolated disputed claim, a practice condemned in prior decisions.");  *In re SBA Factors of Miami, Inc.*, 13 B.R. 99, 100 (Bankr. D. Fla. 1981) (finding involuntary to be filed in bad faith where it was intended by creditors "as a substitute for customary collection procedures.").

[119] In the experience of this judge, attempts to use a bankruptcy court as a court of collection or to foreclose upon liens usually fails.  There is no mass removal of collection actions from state courts to the bankruptcy court.  A bankruptcy court is not concerned with collection in the traditional sense.  A bankruptcy court deals with the allowance of claims if and only if there are assets available for distribution to creditors.  If there are assets in a bankruptcy estate that have no value over and above the secured claim, trustees routinely abandon those assets back to the debtor, and take no interest in any collection actions related thereto.  Those actions do not proceed in a bankruptcy court: instead, debtor and creditor return to the state court from whence they came.

orderly and expeditious liquidation of Miller's non-exempt assets[.]"[120] They also make allusions to alleged preferential transfers by Miller,[121] and the need for the appointment of a trustee "to preserve and administer Miller's estate."[122] However, there is no evidence in the record of any assets to be preserved or transfers to be avoided. The petitioning creditors who claim collateral for their claims have steadfastly argued that their collateral is not worth enough to get them paid. There is no evidence as to what other assets are owned by Miller, or whether those assets have any value that could be reached by a bankruptcy trustee. There is also nothing in the record to suggest that any of the payments made by Miller to his various creditors in the 90-day period prior to the filing of the bankruptcy case are somehow subject to avoidance, or that, even if the filing of an avoidance action were possible, it would make economic sense.[123] The petitioning creditors have had ample opportunity to conduct discovery on these issues, and have presented nothing to the Court. If a petitioning creditor were filing an involuntary bankruptcy petition on the basis that non-exempt assets were being dissipated, or that transfers that would be subject to a trustee's avoiding powers had taken place, a court is entitled to expect <u>some</u> evidence of the same. Absent such evidence, the claims of the petitioning creditors that they acted in good faith ring hollow.

On the basis of the record before it, the Court concludes that the primary (if not the sole) basis for the filing of the involuntary petition was for the petitioning creditors to collect their claims

---

[120] *Petitioning Creditors' Closing Statement and Argument in Support* submitted November 17, 2010, at p. 1.

[121] *Id.* at 32 ("[A]s of May 11, 2010, Miller was preferring some creditors over others, by choosing to pay utilities, workout payments on credit cards, medical bills, and related debts[.]").

[122] *Id.*

[123] For example, one cannot reasonably suggest that monthly payments for items such as utilities would be subject to avoidance.

in this Court.  With respect to those petitioning creditors that were engaged in litigation with Miller

prior to the filing of the involuntary petition, the Court concludes that the primary reason those

creditors filed the involuntary petition was to remove Miller as a real party-in-interest in that

litigation, and replace him with a bankruptcy trustee in the hopes of concluding that litigation as

quickly as possible.  Indeed, the petitioning creditors have as much as admitted the same.[124]  These

are not proper purposes for the filing of an involuntary bankruptcy case.  As a result, the Court will

consider an award of attorney's fees, costs, and damages against the petitioning creditors.

### Conclusion

This involuntary bankruptcy case is dismissed, with the Court retaining jurisdiction to

consider the issue of fees, expenses, and damages to be awarded to Miller.  Miller is hereby

instructed to submit a fee application in line with *In re Reconversion Technologies, Inc.*,[125] within

14 days of the date of this Memorandum Opinion documenting the time spent and fees sought.  If

no such application is filed, the Court will treat any right to an award of fees and expenses as

waived.  If an application for fees is timely filed, the petitioning creditors will have 14 days

thereafter to file any objections to the fees sought.  If the petitioning creditors fail to timely file an

objection to the fees sought, the Court will award fees and expenses in the amount sought.  If both

an application and objection are timely filed, the Court will proceed accordingly, and set the matter

---

[124]  *See Petitioning Creditors' Closing Statement and Argument in Support* submitted
November 17, 2010, at p. 29. ("The Petitioning Creditors filed the Involuntary Petition because
Miller owes them substantial sums of money, Miller has taken objectively unreasonable steps in
thwarting Legacy's and Summit's efforts to foreclose on their collateral (while at the same time
promising his cooperation to both Legacy and Summit, respectively, through the Agreement and
limited power of attorney arrangement)[.]").

[125]  216 B.R. 46 (Bankr. N.D. Okla. 1997).

for further hearing if necessary.

On the issue of damages, Miller shall submit a statement of his claimed damages within 28 days of the date of this Memorandum Opinion.  If no such statement is filed, the Court will treat any right to an award of damages as waived.  If a statement of claimed damages is timely filed, the petitioning creditors will have 14 days thereafter to file any objections to the damages sought.  After these deadlines have expired, the Court will review the matter and take such additional action as it deems necessary.[126]

A separate judgment consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 18th day of January, 2011.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

6003.7

---

[126]  Miller is advised to be reasonable in his requests.  An award of fees, expenses, and/or damages under § 303(b)(1) is discretionary.  The potential for such an award is not to be confused with the holding of a winning lottery ticket.