## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

Filed/Docketed
Jun 07, 2011

IN RE:

**JAMES RANDALL MILLER,**

                **Alleged Debtor.**

**Case No. 10-11541-M**
**Chapter 7**

### SUPPLEMENTAL MEMORANDUM OPINION REGARDING
### AWARD OF ATTORNEYS' FEES AND DAMAGES

*"It ain't over 'til it's over."*[1]

This involuntary bankruptcy case is proof positive of the erstwhile Yankee catcher's wisdom. It has consumed more than a year's time. During that period, the parties have engaged in discovery fights, changed and/or added attorneys, and left little more than scorched earth in the wake of their litigation. One petitioning creditor sought to withdraw from the fray, only to later change its mind. After a two-day trial on the issue of whether the unhappy creditors were entitled to place the alleged debtor in bankruptcy court against his will, the alleged debtor prevailed, and the case was dismissed. The only task remaining for this Court (unless and until an appellate court says otherwise) is to determine the amount of fees and damages, if any, to be awarded to the alleged debtor. With all due respect to Yogi, the war between these parties may be far from over, but we have come to the end of this inning.

### Jurisdiction

The Court has jurisdiction over this bankruptcy case pursuant to 28 U.S.C.A. § 1334(b).[2] Reference to the Court of this contested matter is proper pursuant to 28 U.S.C.A. § 157(a). The

---

[1] Yogi Berra, *The Yogi Book: "I Really Didn't Say Everything I Said,"* Workman Publishing Company, 1999.

[2] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C.A. § 101 *et seq*. (West 2010).

determination of whether fees and/or damages should be awarded in an involuntary bankruptcy case is a core proceeding as contemplated by 28 U.S.C.A. § 157(b)(2)(A).

The Court entered its memorandum opinion and judgment dismissing the involuntary case on January 18, 2011, leaving the issue of damages to be determined upon further submissions by the parties.[3]  The order dismissing this involuntary petition was appealed on January 27, 2011.[4]  While the appeal divested the Court of jurisdiction over the issues determined in the memorandum opinion and judgment, the Court retains jurisdiction over the award of attorneys' fees and damages.[5]

## Background

The parties to this action are J. Randall Miller, the alleged debtor ("Miller"), an attorney engaged in the practice of law in Tulsa, Oklahoma, and four petitioning creditors, Legacy Real Estate Investments, LLC ("Legacy"), Summit Bank, NA, Louis and Patricia Bullock, d/b/a Bullock & Bullock ("Bullock"), and Harley Consulting, LLC (collectively, the "petitioning creditors").  The details of the relationships between Miller and the petitioning creditors have been fully outlined in the memorandum opinion and judgment dismissing the involuntary petition and need not be repeated here.[6]  Suffice it to say the petitioning creditors filed an involuntary petition against Miller that he contested.  At the conclusion of the trial on the involuntary petition, the Court ruled in favor of Miller and against the petitioning creditors, and dismissed the involuntary petition.  As part of its ruling, the Court determined that the petitioning creditors brought the involuntary petition for

---

[3]  *Docket Nos. 129 and 130.*

[4]  *Docket No. 133*.

[5]  *See, e.g., In re VII Holdings Co.,* 362 B.R. 663, 666 n.3 (Bankr. D. Del. 2007); *In re Allen-Main Assocs. Ltd. P'ship*, 243 B.R. 606, 609 (Bankr. D. Conn. 1998).

[6]  *See In re Miller*, 444 B.R. 446 (Bankr. N.D. Okla. 2011).

improper purposes, and that the petition had not been filed in good faith.  Miller was provided with an opportunity to submit evidence and argument in support of an award of fees and damages.

The numbers are in, and they are sizeable.  Miller seeks fees and expenses incurred in defending the involuntary petition in the amount of $289,069.25.  He seeks $812,791.29 in compensatory damages, and punitive damages between $1,600,000 and $4,000,000.   Not surprisingly, the petitioning creditors have objected to certain of the fees, and all of the compensatory and punitive damages.  The matter is ripe for decision.[7]

### Legal Basis for the Award of Fees and Damages

Miller predicates an award of fees and damages upon § 303(i) of the Bankruptcy Code.[8]

---

[7]  The Court had a concern with the expenditure of further judicial resources on the issues of fees and damages at this point in time, given that the decision to dismiss the involuntary petition is on appeal.  It seemed that if the decision to dismiss the involuntary petition were reversed or if the appellate court found that the petitioning creditors had not acted in bad faith, then all or a significant portion of the issues regarding fees and damages would be rendered moot.  On the other hand, if the decision were affirmed, Miller would likely seek additional fees and/or damages.  In his pleadings, Miller sought the opportunity to conduct additional discovery and requested further evidentiary hearing on fees and damages.  The petitioning creditors, while claiming that no further hearings were necessary, asked the Court to provide them with an opportunity for further discovery in the event the Court held an evidentiary hearing on the issues of fees and damages.  In a hearing held on March 17, 2011, before the Honorable Frank H. McCarthy, the United States Magistrate Judge assigned to the appeal, counsel for Miller and the petitioning creditors told Judge McCarthy that the issues of fees and damages had been fully submitted to this Court, and that the appeal should be stayed pending this Court's ruling on those matters.  Concerned by the inconsistency, this Court held a status hearing on April 19, 2011.  At that hearing, all counsel present, as well as Miller himself, stated that they did not desire the opportunity to present further evidence, and that the issues of fees and damages were fully submitted to the Court.  *See Transcript, Docket No. 159.*  On the basis of these representations, the Court has gone forward on the issues of fees and damages.  Had the parties desired to conduct further discovery and/or present further evidence on these issues, it would have made little sense to this Court to proceed until the appellate process had run its course.

[8]  The section provides that

[i]f the court dismisses a petition under this section other than on consent of all

3

Courts have construed and applied § 303(i)(1) as a "fee-shifting" statute, designed to transfer the costs of litigating the action to the nonmoving party. *See Keiter v. Stracka,* 192 B.R. 150, 160 (S.D. Tex. 1996) (citations omitted). When determining whether to award costs and fees, courts examine the totality of the circumstances. *In re Fox,* 171 B.R. 31, 33 (Bankr. E.D. Va. 1994). More specifically, courts weigh such factors as the reasonableness of petitioners' actions, petitioners' motives and objectives, and the merits of petitioners' view that filing was appropriate. *See In re K.P. Enter.,* 135 B.R. 174, 177 (Bankr. D. Me. 1992). An award of costs and fees does not require a showing of bad faith, but bad faith may be taken into account. *Camelot, Inc. v. Hayden,* 30 B.R. 409, 411 (E.D. Tenn. 1983); *In re Atlas Mach. and Iron Works, Inc.,* 190 B.R. 796, 802 (Bankr. E.D. Va. 1995).[9]

All petitioning creditors, regardless of the viability of their claims against the debtor, are subject to this statute and may be held to pay fees, costs, and damages.[10] An award of fees and/or damages under § 303(i) is a matter left "to the exclusive discretion of the court."[11]

---

petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment–

**(1)** against the petitioners and in favor of the debtor for–

**(A)** costs; or
**(B)** a reasonable attorney's fee; or

**(2)** against any petitioner that filed the petition in bad faith, for–

**(A)** any damages proximately caused by such filing; or
**(B)** punitive damages.

§ 303(i).

[9] *In re Cadillac by DeLorean & DeLorean Cadillac, Inc.,* 265 B.R. 574, 581 (Bankr. N.D. Ohio 2001).

[10] *See In re Kidwell,* 158 B.R. 203, 216 (Bankr. E.D. Cal. 1993) ("If an involuntary petition is dismissed other than on the consent of the debtor and all petitioners, the petitioners may be required to pay the debtor's costs and attorney's fees. 11 U.S.C. § 303(i)(1). All petitioners, even those who have joined under section 303(c), are vulnerable to this remedy that arises upon dismissal of the case.").

[11] *In re Silverman,* 230 B.R. 46, 50 (Bankr. D.N.J. 1998) (and cases cited therein).

4

## I.     *Attorneys' Fees*

Prior to the trial of the involuntary petition, Miller was represented by the law firm of Fellers, Snider, Blankenship, Bailey & Tippens, P.C. ("Fellers Snider").[12]  At trial, Fellers Snider was joined by Clark O. Brewster ("Brewster").  Fellers Snider and Brewster have submitted statements of fees and expenses in the following amounts:

Fellers Snider:

| | |
|---|---|
| Fees: | $228,231.50 |
| Expenses: | $20,877.75 |
| Fellers Snider Total: | $249,109.25[13] |

Brewster:

| | |
|---|---|
| Fees: | $39,960.00[14] |

TOTAL FEES AND EXPENSES:     $289,069.25

The petitioning creditors have filed a limited objection to the Fellers Snider fees, arguing that Miller should not be compensated for unsuccessfully defending a motion to compel discovery brought by the petitioning creditors.  They take issue with Brewster's fees, arguing that his fee statement was not timely filed, his hourly rate is excessive, and his time unnecessarily and unreasonably spent.  The petitioning creditors also contend that any award of fees against them should be offset against the fees that they incurred in prosecution of their motion to compel discovery.

---

[12]   Miller was initially represented in this case by the firm of Doerner, Saunders, Daniel & Anderson, L.L.P. ("Doerner Saunders").  Doerner Saunders withdrew from representation of Miller on June 29, 2010.  Miller has not sought an award of any fees that may have been paid to Doerner Saunders.

[13]   *Docket No. 139.*

[14]   *Docket No. 140.*

5

A.     *Fellers Snider*

Of the $249,109.25 in fees and expenses incurred by Fellers Snider in the defense of the involuntary petition, the petitioning creditors take issue with $18,376.75 in fees and expenses incurred in a discovery battle between Miller and the petitioning creditors.[15]  The question is whether fees incurred by Fellers Snider in unsuccessfully defending a motion to compel filed by the petitioning creditors should be paid by the petitioning creditors.[16]  In order to understand the basis for the Court's decision, a brief summary of the discovery dispute is necessary.

The petitioning creditors propounded discovery upon Miller on or about June 3, 2010.  The discovery included a request for production of documents.  Responses were due no later than July 6, 2010.  By agreement of the parties, the deadline to answer the discovery was extended, first to July 16, 2010, then to July 19, 2010.  On July 19, 2010, Miller served numerous objections to the discovery and refused to produce documents.  On August 5, 2010, the petitioning creditors filed a motion to compel Miller's response to discovery.[17]  As part of the relief sought, the petitioning creditors asked for an award of their fees and expenses incurred in bringing the motion to compel. Miller filed a written response on August 11, 2010, arguing that an alleged conflict of interest with respect to counsel for Legacy justified his failure to respond to discovery, that he was entitled to a protective order before any documents were produced, and that the failure of new counsel for the

---

[15]  *See Docket No. 143-1* at 3.  The petitioning creditors do not take issue with the balance of the fees incurred by Fellers Snider.  The Court has reviewed those fees and has no independent concerns with them.  They will be allowed as uncontested.

[16]  For the record, the discovery at issue was propounded in the name of Legacy. However, the Court has little doubt that this discovery was issued for the benefit of all of the petitioning creditors.

[17]  *Docket No. 43.*

petitioning creditors to meet and confer prior to the filing of the motion to compel mandated denial of the motion.[18]   None of these arguments were made or objections filed prior to the deadline for Miller's discovery responses.  Miller cited no case law in support of his position.  The August 11, 2010, pleading marked the first time Miller made any mention to the Court of the need for a protective order.

An evidentiary hearing was held on the motion to compel on August 13, 2010.  The hearing was hotly contested.  On August 18, 2010, the Court granted the motion to compel in its entirety.[19] The Court held that Miller waived any and all objections to the discovery as a result of his failure to timely serve objections.  Moreover, the Court determined that the alleged ethical issues relating to former counsel for Legacy did not provide a proper basis for objecting to the discovery.  The Court also found that former counsel for the petitioning creditors had made numerous attempts to resolve the discovery dispute prior to the filing of the motion to compel, and that those efforts satisfied the "meet and confer" requirements contained in Federal Rule of Civil Procedure 37(d)(1)(B).  The Court found that Miller had no colorable basis for opposing the discovery sought by the petitioning creditors.  The Court deferred the issue of any award of fees relating to the motion to compel until the merits of the involuntary petition were determined.

The Federal Rules of Civil Procedure are clear:  when it comes to interrogatories, "[t]he grounds for objecting to an interrogatory must be stated with specificity.  Any ground not stated in a timely objection is waived unless the court, for good cause, excuses the failure."[20]   Not

---

[18]   *Docket No. 50.*

[19]   *Docket No. 61.*

[20]   Fed. R. Civ. P. 33(b)(4), made applicable to involuntary bankruptcy proceedings by Federal Rules of Bankruptcy Procedure 1018 and 7033.

surprisingly, courts that have dealt with this rule have held that it means what it says: untimely

objections are of no force and effect unless the court excuses the delay.[21]  Although Federal Rule

of Civil Procedure 34, dealing with the production of documents, is silent on the issue, courts have

held that the same waiver rule applies to requests for production of documents.[22]  The question is

whether Miller is entitled to fees incurred with respect to a discovery issue where he had no realistic

hope of success.

Many courts, including the United States Supreme Court, have answered this question in the

negative.

> Another general principle involved in fee-shifting disputes is that compensation
> should not be awarded for litigating unsuccessful claims.  In the context of applying
> the permissive fee-shifting provisions of 42 U.S.C. § 1988, the Supreme Court
> instructed:
>
>> [T]he extent of a plaintiff's success is a crucial factor in determining
>> the proper amount of an award of attorney's fees under 42 U.S.C. §
>> 1988.  Where the plaintiff has failed to prevail on a claim that is
>> distinct in all respects from his successful claims, the hours spent on
>> the unsuccessful claim should be excluded in considering the amount
>> of a reasonable fee.  Where a lawsuit consists of related claims, a
>> plaintiff who has won substantial relief should not have his attorney's
>> fee reduced simply because the district court did not adopt each
>> contention raised.  But where the plaintiff achieved only limited
>> success, the district court should award only that amount of fees that
>> is reasonable in relation to the results obtained.

*Hensley*, 461 U.S. at 440, 103 S.Ct. 1933; *see, e.g., In re Pierce*, 165 B.R. at 256; *In
re Leach*, 102 B.R. 805, 808 (Bankr. D. Kan. 1989).[23]

---

[21]  *See, e.g., Swackhammer v. Sprint Corp. PCS*, 225 F.R.D. 658, 665 (D. Kan. 2004);
*Horace Mann Ins. Co. v. Nationwide Mut. Ins. Co.*, 238 F.R.D. 536, 538 (D. Conn. 2006) (and
cases cited therein).

[22]  *Horace Mann Ins. Co.*, 238 F.R.D. at  538 (and cases cited therein); *Pulsecard, Inc. v.
Discover Card Servs., Inc.*, 168 F.R.D. 295, 303 (D. Kan. 1996).

[23]  *In re Diloreto*, 388 B.R. 637, 653 (Bankr. E.D. Pa. 2008).

Counsel for Miller knew or should have known that, as a matter of law, objections to discovery that are not timely raised are deemed waived.  In addition, counsel should have known that the way to deal with objectionable discovery is to file timely objections to the discovery and/or a motion for protective order and thus submit the matter to the Court, rather than to take matters into one's own hands and simply refuse to produce documents.

Counsel for the petitioning creditors have identified a total of $17,875.50 in fees and $501.25 in expenses incurred by Fellers Snider that directly relate to the defense of the motion to compel.[24] The Court has reviewed the fees and expenses identified by the petitioning creditors and agrees that those fees and expenses pertain to the defense of the motion to compel.[25]  Miller is not entitled to judgment for those fees.  The Court awards Miller the sum of $230,732.50 in fees and expenses incurred on his behalf by Fellers Snider.

### B.    Clark Brewster

Brewster entered an appearance in this case as co-counsel for Miller on October 18, 2010.[26] Brewster appeared at the trial of the involuntary action, questioning witnesses, raising objections, and actively participating in the trial.  In addition, it appears that Brewster was also involved in attempts to resolve this involuntary case through mediation.  Brewster has expended a total of 113.40 hours and seeks compensation for his time at the rate of $350.00 per hour, for a total fee of

---

[24] *See Docket No. 143, Exhibit A.*

[25] Some of the entries contain descriptions of time spent on both the defense of the motion to compel and other non-related matters.  Those entries are "lumped" to the point that the Court cannot determine the amount of time spent on the defense of the motion to compel and the time spent on other matters.  As a result of the "lumping" of these time entries, the Court shall disallow the lumped time entries in their entirety.  *See In re Reconversion Techs., Inc.*, 216 B.R. 46, 57–58 (Bankr. N.D. Okla. 1997).

[26] *Docket No. 110.*

$39,960.00.[27]

The petitioning creditors object to Brewster's application for a variety of reasons. They claim it was not timely filed. They suggest that Brewster's efforts were duplicative and unnecessary, and argue that Brewster should not be compensated for time spent familiarizing himself with the facts and background of the case. Finally, the petitioning creditors allege that Brewster has failed to provide the Court with sufficient detail regarding the nature of services performed.

    *1.*    *Timeliness*

The Court entered its memorandum opinion and judgment dismissing this involuntary petition on January 18, 2011.[28] The judgment required Miller to "submit a statement within 14 days of the date of this Judgment documenting the time spent and fees and expenses sought in the litigation of this involuntary petition."[29] It went on to state that "if no such application is filed, the Court will treat any right to an award of fees and expenses as waived."[30] The fourteen-day period after entry of the judgment expired on February 1, 2011. Brewster submitted his statement of fees on February 7, 2011. At first blush, Brewster's submission appears untimely.

Things are not always as they seem. February 1, 2011, saw the beginning of one of the largest blizzards in the history of the city of Tulsa (the "Blizzard").[31] As a result of the Blizzard, the office of the Clerk of this Court was closed February 1, February 2, and February 3, 2011, reopening

---

[27]  *Docket No. 140.*

[28]  *Docket Nos. 129 and 130.*

[29]  *Docket No. 130.*

[30]  *Id.*

[31]  As counsel know, this judge hails from Nebraska. Nebraskans know the difference between a snow shower, a snow storm, and a blizzard. This was a blizzard.

for business with a limited staff on Friday, February 4, 2011.  Brewster submitted his statement of

fees the next business day, Monday, February 7, 2011.  Petitioning creditors submit that this Court

should grant Brewster no quarter, and strike his submission as untimely.

While the Court understands the argument advanced by the petitioning creditors, the equities

of the case favor consideration of Brewster's fee statement on its merits.  The Court does not know

what manner of chaos the Blizzard precipitated (no pun intended) in the various law offices located

within the city of Tulsa; however, the Court is familiar with the effects of the Blizzard in chambers

and in the office of the Clerk of this Court.  Even in this electronic world, many of the daily tasks

of the Clerk's office and chambers were brought to a standstill.  The paralyzing effects of the

Blizzard were not limited to the legal community.  Many basic city services were impaired or

rendered nonexistent.  Against the backdrop of those circumstances, granting Brewster a one-day

extension of time to submit his fee statement seems reasonable.

The purpose of § 303(i) is to compensate an alleged debtor for the fees and expenses incurred

in defense of the failed involuntary petition.  That purpose is best served by considering Brewster's

fees on their merits and would be thwarted by denying fees on the basis of a one-day delay.  The

petitioning creditors have been given a full and adequate opportunity to review the time statements

submitted by Brewster and file an objection based upon the merits.  The Court believes it is within

its discretion to consider both Brewster's time entries and the petitioning creditors' objections.

2.    *Necessity of Brewster's Involvement*

The petitioning creditors also argue that, should the Court consider Brewster's fees on their

merits, they should be disallowed because any service performed by Brewster was "excessive and

duplicative" in light of the fact that Miller was already represented by Fellers Snider.  The argument

11

is unpersuasive.  Though a determination of how many attorneys is enough is not a simple exercise in counting heads, the Court notes that while Miller had a total of three attorneys representing him at the trial of the involuntary petition, the petitioning creditors brought no less than seven attorneys to trial.  While the Court is not in a position to monitor the efforts of counsel outside the doors of the courtroom, the Court did observe Brewster's performance in the courtroom.  He was an effective advocate.  He was well prepared.  He understood the issues before the Court.  His opening statement and cross examination of a key witness were effective.  The Court concludes that Brewster contributed to the effective representation of Miller and that compensation for his services is appropriate.[32]

    *3.*    *Hourly Rate*

    The petitioning creditors object to Brewster's hourly rate of $350.00.  They suggest that the Court should not consider that rate because it is reportedly the highest rate billed by any attorney in this case.  The Court will, for purposes of argument, consider this to be a representation by the petitioning creditors that none of their attorneys have billed at a rate higher than $350.00 per hour.  The highest hourly rate billed by Fellers Snider is that of Mr. Stephen Moriarty, whose hourly rate of $335.00 is nearly equal the rate sought by Brewster.  No objections have been raised to Mr. Moriarty's hourly rate, nor has there been any suggestion that the rate is not the rate ordinarily and customarily charged by Brewster.  While an hourly rate of $350.00 is rare in this Court, it is not unheard of.  The Court will allow it.

---

[32] The Court believes that the petitioning creditors have a limited voice with respect to the trial strategy employed in the defense of the involuntary petition.  Miller brought in additional counsel that was well prepared and effective.  The Court is loath to allow the petitioning creditors to second guess that decision.  Rarely, if ever, should opposing counsel be allowed to dictate each other's strategies.

4.      *Time Spent*

The petitioning creditors also object to the efforts undertaken by Brewster to familiarize himself with the case, and suggest that the same should not be compensated.  Specifically, the petitioning creditors object to 29.5 hours of time spent by Brewster in familiarizing himself with the facts of this case and preparing for an unsuccessful mediation between Miller and the petitioning creditors.  Having reviewed the time entries, the Court finds them to be reasonable for purposes of allowance of fees under § 303(i).  Brewster's familiarity with the facts and circumstances of this case was apparent at the trial of the involuntary petition.  The Court rejects the suggestion that an attorney should not be compensated for time spent that allows that attorney to appear in court well prepared, well organized, and articulate.

The Court is not persuaded by the argument of the petitioning creditors that some of Brewster's time entries are unduly vague.  Although some of the entries contain less detail than is normally seen by this Court in fee applications, the Court, upon review of the fee statement, is able to sufficiently understand the nature of the services rendered for purposes of making an award.  The Court is satisfied that an award of $39,960.00 based upon the services provided by Brewster is appropriate.[33]

The Court finds that the fees sought by Brewster are the appropriate subject of an award under § 303(i).  Judgment will be granted for Miller in the amount of $39,960.00 as a result of the fees incurred by Brewster.

---

[33] As the Bankruptcy Appellate Panel of the Tenth Circuit has noted, when reviewing applications for fees, a bankruptcy court is not required to conduct "a detailed review and discussion of the line by line entries.  The Court may make a subjective judgment based upon the entire circumstances presented." *In re Tahah*, 330 B.R. 777, 781 (BAP 10th Cir. 2005) (citation omitted).  *See also In re Rogers*, 401 B.R. 490, 493 (BAP 10th Cir. 2009) (same).

### C.    *Fees Incurred by the Petitioning Creditors for the Motion to Compel*

Rule 37 of the Federal Rules of Civil Procedure ("Rule 37"), made applicable to this proceeding by Federal Rules of Bankruptcy Procedure 1018 and 7037, governs motions to compel in discovery matters.   Rule 37(a)(5)(A) governs fee awards when a motion to compel has been denied.  That rule provides:

**(a)  Motion for an Order Compelling Disclosure or Discovery.**

(5) *Payment of Expenses; Protective Orders.*

(A) *If the Motion Is Granted (or Disclosure or Discovery Is Provided After Filing).* If the motion is granted—or if the disclosure or requested discovery is provided after the motion was filed—the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees. But the court must not order this payment if:

(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action;

(ii) the opposing party's nondisclosure, response, or objection was substantially justified; or

(iii) other circumstances make an award of expenses unjust.[34]

Wright and Miller summarize the rule with beautiful simplicity: "[t]he great operative principle of Rule 37(a)(5) is that the loser pays."[35]

The petitioning creditors have identified $10,715.00 in fees and $204.23 in expenses incurred

---

[34]  Fed. R. Civ. P. 37(a)(5)(A).

[35]  8B Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice & Procedure* § 2288 at 515 (3d ed. 2010) (footnote omitted).

by the petitioning creditors in the successful prosecution of their motion to compel.[36]  The Court has reviewed the fees and expenses incurred by the petitioning creditors and finds them to be reasonable. The Court will therefore deduct a total of $10,919.23 from the attorney fee award in favor of Mr. Miller.

Miller is awarded a total of $259,773.27 in attorneys' fees and expenses.  The award is against all petitioning creditors, and they shall be held jointly and severally liable for the amounts due.  The award shall be in the form of a judgment that may be enforced by Miller.

## II.   *Actual Damages*

In order to recover actual damages under § 303(i)(2), an alleged debtor must establish that the claimed damages were proximately caused by the filing of the involuntary petition.[37]  One court has held

> [t]o constitute proximate cause, there must be a "reasonably close causal connection between the conduct and the resulting injury." *Miller–Schmidt v. Gastech, Inc.,* 864 F.2d 1181, 1184 (5th Cir. 1989). Therefore, under § 303(i), "proximate cause is the ... negligent act that actively aids in producing the injury as a direct and existing cause." *George v. Brandychase Limited Partnership,* 841 F.2d 1094, 1096 (11th Cir. 1988).[38]

Another court has compared the improper filing of an involuntary petition to a malicious prosecution case, holding that "the general rule is the plaintiff may recover all damages that are the natural and probable consequence of the action complained of.  The damages must be certain and proximate,

---

[36]  *Docket No. 143, Ex. "B."*

[37]  *In re John Richards Homes Bldg. Co.*, 439 F.3d 248, 262 (6th Cir. 2006).  *See also In re TRED Holdings, L.P.*, 2010 WL 3516171 (Bankr. E.D. Tex. 2010).

[38]  *In re Kearney*, 121 B.R. 642, 644 (Bankr. M.D. Fla. 1990).

and not uncertain, contingent or speculative."[39]

Miller seeks a total of $812,791.29 in actual or compensatory damages that may be broken down into two categories.  Miller seeks reimbursement for time spent and costs incurred in defense of the involuntary in the amount of $137,791.29.  In addition, Miller claims that he is entitled to $675,000.00 representing a continuing loss of future income in the amount of $135,000.00 per year for a period of five years.  In support of this damage claim, Miller offers his affidavit containing time records for the amount of time spent and conclusory statements regarding his loss of future income.[40]

### A.    *Time Spent*

*1.    Miller*

Miller has cited no authority for the proposition that an alleged debtor may bill for his or her own time spent defending an involuntary petition.  The Court is aware of no such authority.  Even if such an award were proper, the time entries submitted by Miller are so vague as to prevent the Court from making any meaningful inquiry regarding the work performed.  For example, Miller has submitted not less than 32 time entries with the notation "working on involuntary bankruptcy; research."[41]  Other time entries are equally vague.  In addition, much of the time spent by Miller appears to have been unnecessary.  Several time entries, totaling 70 hours in time spent, relate to tasks performed *after* the deadline for submission of written closing argument.[42]  It is difficult to

---

[39] *Sjostedt v. Salmon (In re Salmon)*, 128 B.R. 313, 316 (Bankr. M.D. Fla. 1991).  *See also In re Atlas Mach. & Iron Works, Inc.,* 190 B.R. 796, 804 (Bankr. E.D. Va. 1995).

[40] *Affidavit of James Randall Miller in Support of Statement of Claimed Damages, Docket No. 148-1,* (hereafter referred to as the *"Miller Affidavit"*).

[41] *See, e.g., Docket No. 148-2 at 2–3.*

[42]  Trial of the involuntary petition took place on October 19 and 20, 2010.  The parties agreed to submit simultaneous written closing arguments 14 days after the trial transcripts were

understand the need to expend time when there was nothing left to do but await the Court's decision. It is equally difficult to understand how the petitioning creditors caused Miller to expend time on a case after the case was fully tried and briefed.

The Court declines to award Miller any damages for the time he spent with respect to the involuntary petition.

    2.    *Associates of Miller*

Miller seeks compensation for time spent by two other individuals, Shanda Garrison ("Garrison") and Rayanne G. Tobey ("Tobey").  It appears that Garrison and Tobey are employed by Miller's law firm.  At no time prior to the submission of his affidavit was the Court aware of their involvement in the case.  Several of Garrison's entries indicate that she "assisted" Miller with his involuntary bankruptcy research.  These time entries are too vague to justify an award, even if Garrison were a properly retained professional.  Other of her time entries deal with production of documents.  As previously noted, the Court has ruled that Miller had no reasonable basis for refusing to produce documents to the petitioning creditors. The Court declines to award these fees for the same reasons the Court declined to award Miller the fees incurred by Fellers Snider in opposing the motion to compel.  The Court does not believe that Miller is entitled to compensation for obeying a court order.

A review of the time spent by Tobey reveals that the vast majority of her time was spent on the conflict of interest issue with respect to the motion to compel, preparation of discovery

---

filed of record, with replies due seven days thereafter.  The trial transcripts were filed on November 9, 2010, which made the initial closing arguments due on or before November 23, 2010, and replies due by November 30, 2010.  *See Docket Nos. 113, 119, and 120.*

responses, and preparation of Miller for deposition.[43]  A review of the Fellers Snider time records

shows that they were engaged in the same tasks.  Even if Miller were entitled to compensation for

Tobey's services, the Court cannot determine whether they were duplicative of the efforts of Fellers

Snider.

      With respect to both Garrison and Tobey, although Miller's affidavit refers to the "value"

of their time, there is nothing to show that Miller actually paid Garrison, Tobey, or his law firm for

their services.  There is nothing to establish that the time spent by Garrison and/or Tobey caused

Miller or his law firm to lose revenue.  In any case, if Garrison or Tobey were acting as Miller's

counsel in this case, any application for payment of their fees should have been filed at the same

time as the Fellers Snider or Brewster applications.  They were not.  The Court declines to award

Miller damages for the services rendered by Garrison or Tobey.

      Miller also seeks judgment for $2,361.79 in electronic research charges.  On the record

before it, the Court cannot determine the nature of the electronic research performed.  A significant

portion of the charges appear to have been incurred after all issues pertaining to the involuntary

petition were submitted to the Court.[44]  The Court declines to award Miller any of these charges.

---

[43] *Docket No. 148-2* at 4.

[44] *See id.* at 19.

18

### B.      Lost Income

Miller seeks damages of $675,000 representing future lost income of $135,000 per year for the next five years.  The only information from Miller regarding this calculation is found in paragraph 24 of the Miller Affidavit:

> It is my considered opinion that in addition to the monetary actual damages I have incurred that [I] will continue to suffer damages due to my lack of ability to devote my time and attention to the practice of law this past year, and attract new business. Over the upcoming five (5) years my expected continuing loss of earnings and net income is substantially in excess of  $135,000.00/year for a five year total from and after May 11, 2011 to May 11, 2016 or [sic] $675,000.00.  I have not included any amount reflecting an increase in current billing rates.  I am absolutely confident in representing to the Court that the foregoing actual damage amounts are very conservative. [45]

The burden is upon Miller to establish his damages with a degree of certainty, and to show that those damages were proximately caused by the filing of the involuntary petition.  Miller bases his claim for lost income upon: (1) his inability to develop his practice due to time spent defending the involuntary petition; (2) adverse publicity as a result of the filing of the involuntary petition; and (3) physical and mental injury suffered as a result of the filing of the involuntary petition.  The evidence does not support these contentions.

### 1.      Time spent on the involuntary case

The time records provided by Miller show that in the period between May 24, 2010, and December 31, 2010, Miller spent a total of 277.1 hours on matters pertaining to his involuntary petition.  This averages to approximately 39.5 hours per month, or one day per week.  While such a time commitment might impair one's ability to develop a law practice, it is not enough to destroy it.  The Court gives no weight to the 70 hours of time allegedly spent on this case by Miller after the

---

[45] *Miller Affidavit,* ¶ 24.

submission of closing arguments, as there was nothing for Miller to do while the matter was under advisement.  If one deducts those 70 hours, then the demands foisted upon Miller's time by this case average less than 30 hours per month.  The Court cannot conclude that such a limited time demand destroyed Miller's ability to either practice law or to develop his practice.

       *2.*     *Adverse Publicity*

Miller's contention that adverse publicity from the involuntary case has harmed his practice is also unsupported.  There is nothing in the record to show that the petitioning creditors "published" notice of the involuntary petition or that any such publication had a deleterious effect upon Miller's law practice.  The only evidence offered in support of the alleged publication is the fact that the *Tulsa World*, a newspaper of general circulation in the Tulsa, Oklahoma area, published a one sentence statement noting the filing of the involuntary bankruptcy proceeding in the business records section of the *Tulsa World* on May 23, 2010.[46]  The Court takes judicial notice of the fact that the *Tulsa World* routinely publishes a list of all business bankruptcy filings made before this Court.  Miller has not shown that the one sentence notice published in the *Tulsa World* caused any damage to his law practice, or that the petitioning creditors undertook any other steps to publicize the filing of the involuntary petition.  Each petitioning creditor categorically denies any such activity.

Miller also points out that notice of the filing of the involuntary was filed in other courts where Miller and the petitioning creditors were litigating.  Such notice is routine and often required by court rule.  The Court finds nothing actionable in the fact that the petitioning creditors notified another court of the involuntary bankruptcy filing.

       *3.*     *Physical and Mental Injury*

---

[46] *Docket No. 148-2 at 6–7.*

Miller claims that the filing of the involuntary bankruptcy case constituted "physically and emotionally exhausting abuse" that resulted in lost income.  Miller provided the Court with no independent evidence to support his claims of physical harm and/or emotional distress brought on as a result of the involuntary filing.  Miller did provide the Court with historical information regarding his health.  If anything this information clouds the issue of whether any actions taken by the petitioning creditors were the proximate cause of any lost profits.

Miller has a history of heart problems, suffering his first heart attack in March 1988.[47] Miller's heart condition grew progressively worse.  On April 28, 1997, Miller suffered what he described as a "near fatal heart failure," and was advised that he had a life expectancy of no more than 36 months.[48]  Miller immediately retired from the practice of law.  He remained retired until the spring of 2003, when he returned to the practice, serving as co-counsel with Bullock in civil rights litigation then pending in the United States District Court for the Northern District of Oklahoma.  According to Miller, after that litigation concluded, Miller returned to the full-time practice of law.

Miller's return to the practice of law was again interrupted on May 19, 2007, when he was involved in a serious vehicular collision.  His injuries included thirteen broken bones as well as "closed brain injuries."[49]  Treatment for these injuries is ongoing to this day.  Miller candidly admits that these injuries, as well as his heart condition, may well have an effect on his ability to generate

---

[47] *Miller Affidavit,* ¶ 12.

[48] *Id.*

[49] *Id.* at ¶ 14.

income.[50]

Miller's claim for damages to his law practice fails the tests of certainty and causation. The "lost profits" of $675,000 are based upon nothing more than Miller's speculation. The record contains no historical data to support this figure. There is no foundation in the Miller Affidavit for the $675,000 figure. The Court has no idea whether Miller had a profitable law practice prior to the filing of the involuntary petition. Even if the $675,000 figure were somehow supported, Miller has failed to show how the filing of the involuntary petition was the proximate cause of his alleged losses. There is nothing in the record to show that the petitioning creditors "published" notice of the filing of the involuntary petition or that any such publication had a deleterious effect upon Miller's law practice. It is equally impossible to conclude that the filing of the involuntary petition kept Miller from the practice of law. Certainly the time spent by Miller himself is not of a magnitude as to preclude the practice of law. Miller's claims of "physically and emotionally exhausting abuse" are unsubstantiated by any medical showing of harm. Moreover, Miller has identified numerous health issues that predate the filing of the involuntary case, each of which, standing alone, could be sufficient to cause these losses. An award of actual damages for lost profits would be an exercise in pure speculation, as would a finding that any such damages were caused by the filing of the involuntary petition.

The speculative nature of the damages sought becomes even more apparent when one compares the evidence offered by Miller to the evidence relied upon by those courts that have awarded actual damages upon the dismissal of an involuntary petition. For example, in *In re John*

---

[50] *Id.* at ¶ 24.

*Richards Home Building Co.,*[51] the bankruptcy court awarded the alleged debtor, an individual engaged in the construction of luxury homes, compensatory damages of $4,100,000.   The damage award was based upon historical information regarding the number of homes constructed in the five-year period preceding the filing, the cost of those homes, and the historical profit margin.   The alleged debtor also presented evidence that although the market for such homes had not declined, his market share had fallen off precipitously.[52]   In addition, the alleged debtor in *Richards* presented evidence that the petitioning creditor had affirmatively and aggressively publicized the filing of the involuntary bankruptcy, going so far as to hire a pubic relations firm in order to "publicize the bankruptcy filing."[53]   We have no such evidence in this case.

In *In re Cannon Express Corp.,*[54] the United States Bankruptcy Court for the Western District of Arkansas awarded an alleged debtor actual damages of $14,230.14, based upon uncontradicted evidence that, as a result of the filing of the involuntary petition, the Arkansas Worker's Compensation Commission had liquidated a certificate of deposit owned by the alleged debtor, resulting in an early withdrawal penalty of $14,230.14.[55]   Conversely, in *In re Microstructure*

---

[51] 291 B.R. 727 (Bankr. E.D. Mich. 2003), *aff'd*, 312 B.R. 849 (E.D. Mich. 2004), *aff'd,* 439 F.3d 248 (6th Cir. 2006) (hereafter *"Richards"*).

[52] *Id.* at 735–36.

[53] *Id.* at 732.   The public relations firm created press releases accusing the alleged debtor of making "payoffs" to various parties, alleging that a hearing scheduled in state court "is sure to be worthy of coverage with plots and subplots and high profile business people coming to the surface." *Id.*

[54] 280 B.R. 450 (Bankr. W.D. Ark. 2002).

[55] *Id.* at 457.

*Technologies, Inc.*,[56] the court declined to award alleged lost profits of $118,400 because the alleged

debtor "fail[ed] to present sufficient evidence to support this amount, [] failed to properly account

for costs that were not deducted, and failed to establish that this loss was proximately caused by the

filing."[57]   Although they reach different results, both cases stand for the same principle: actual

damages must be proven in order to be recovered.

In order for an alleged debtor to recover actual damages under § 303(i), the alleged debtor

must prove the damages with a degree of certainty and must prove that those damages were

proximately caused by the filing of the involuntary petition.  Miller has failed on both counts.  His

request for damages in the form of lost profits is denied.

### III.    *Punitive Damages*

Miller seeks an award of punitive damages against the petitioning creditors in an amount

between $1,600,000 and $4,000,000.  Such an award would be one of the highest, if not the highest,

punitive damage awards in the history of involuntary bankruptcy in the United States of America.[58]

In order to decide this issue, a thorough understanding of the applicable law is necessary.  To quote

another Yogism, "[y]ou need to be careful if you don't know where you're going because you might

---

[56] 2009 WL 2208590 (Bankr. W.D. Wash. 2009).

[57] *Id.* at * 6.

[58] The United States Bankruptcy Court for the Eastern District of Michigan awarded
$2,000,000 in punitive damages against petitioning creditors in *Richards*.  At the time, this was
the highest reported punitive damage award in an involuntary bankruptcy case.  The Court has
not been able to locate any subsequent decisions awarding punitive damages in excess of
$2,000,000.  In the only case cited to the Court by Miller on the issue of punitive damages, the
court issued a punitive damage award of $130,000.  *In re S. Cal. Sunbelt Developers, Inc.*, 608
F.3d 456 (9th Cir. 2010).

not get there."[59]

The United States Supreme Court has provided guidance on the factors to be considered when it comes to awarding punitive damages:

> [W]e [have] instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.  We reiterated the importance of these three guideposts in *Cooper Industries* and mandated appellate courts to conduct *de novo* review of a trial court's application of them to the jury's award. Exacting appellate review ensures that an award of punitive damages is based upon an "'application of law, rather than a decisionmaker's caprice.'"[60]

The Supreme Court went on in *Campbell* to note that

> "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." We have instructed courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. The existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect. It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence.[61]

The purposes of punitive damages "are to punish the wrongdoer, to deter him from repeating his

---

[59]   Yogi Berra, *The Yogi Book: "I Really Didn't Say Everything I Said,"* Workman Publishing Company, 1999.

[60]   *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003) (citations omitted) (hereafter *"Campbell"*).

[61]   *Id.* at 419 (citations omitted).

25

misdeeds, and to set an example so that others will be dissuaded from engaging in such conduct."[62]
As with all damages under § 303(i), an award of punitive damages is a matter left to the discretion
of the bankruptcy court.[63]

In the Miller Affidavit, Miller makes reference to the "physically and emotionally exhausting
abuse" heaped upon him by the petitioning creditors, and also alleges that those creditors caused the
filing of this involuntary bankruptcy case to be "aggressively and widely publicized."[64]  The only
alleged "publication" in evidence is the one sentence statement noting the filing of the involuntary
bankruptcy proceeding in the business records section of the *Tulsa World*.[65]  There is no evidence
that the petitioning creditors had anything to do with the publication activities of the *Tulsa World*.
The only other matters "published" with respect to this involuntary bankruptcy proceeding would
be the memorandum opinion and judgment dismissing the involuntary case.  Once again, the
petitioning creditors had nothing to do with that publication.  There is no evidence before the Court
to suggest the petitioning creditors did anything but file an involuntary bankruptcy, litigate it
strenuously, and ultimately fail.  The Court does not believe that such conduct supports an award
of punitive damages under the principles outlined by the United States Supreme Court in *Campbell*.

The ultimate question regarding punitive damages is one of deterrence:  does the Court need
to punish the petitioning creditors with an additional monetary sanction to ensure that the petitioning

---

[62]  *In re K.P. Enters.*, 135 B.R. 174, 183 (Bankr. D. Me. 1992) (citation omitted).
*Accord, In re Cannon Express Corp.*, 280 B.R. 450, 462 (Bankr. W.D. Ark. 2002).

[63]  *In re Advance Press & Litho, Inc.*, 46 B.R. 700, 701 (Bankr. D. Colo. 1984); *In re K.P.
Enter.*, 135 B.R. at 183 ("Section 303(i)(2) clearly provides for a discretionary punitive damages
award, but imposition of punitive damages does not necessarily follow a bad faith finding.").

[64]  *Miller Affidavit*, ¶ 26.

[65]  *Docket No. 148-2 at 6-7.*

creditors, and others similarly situated in the future, do not misuse the involuntary bankruptcy process?  In this case, as a result of their actions, petitioning creditors have to bear not only their own fees, but are now indebted to Miller in an amount in excess of $250,000.   While Miller would characterize this as little more than a slap on the wrist, the Court disagrees.   A quarter of a million dollars is still a lot of money to most folks.

## Conclusion

Miller is awarded a total of $259,773.27 in attorneys' fees and expenses.   The Court shall issue a separate judgment in favor of Miller and against the petitioning creditors in that amount, jointly and severally, plus interest from and after the date of judgment at the federal judgment interest rate.[66]  The Court declines to award compensatory or punitive damages.

Dated this 7th day of June, 2011.

BY THE COURT:

TERRENCE L. MICHAEL, CHIEF JUDGE
UNITED STATES BANKRUPTCY COURT

6124.7

---

[66]  Miller may then reduce the judgment to cash, which, as Yogi told us in a famous commercial, "is just as good as money."  *See*  www.youtube.com/watch?v=O-EZf56AfYc.

27